COMMONWEALTH of Pennsylvania,
Appellee,

v.

Jackie LONER, Appellant.

Superior Court of Pennsylvania.

Submitted June 23, 2003.
Filed Oct. 22, 2003.

See also 609 A.2d 1376

John J. O'Brien, Charleston, South Carolina, for appellant.

Ray F. Gricar, Assistant District Attorney, Bellefonte, for Commonwealth, appellee.

Before: DEL SOLE, P.J., JOHNSON, HUDOCK, MUSMANNO, LALLY–GREEN, KLEIN, BENDER, BOWES and GRACI, JJ.

HUDOCK, J.

¶ 1 This is an appeal from the order of the court below denying Appellant's petition seeking post-conviction relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. sections 9541–46. We affirm.

¶ 2 In March of 1990, a jury convicted Appellant of three counts each of rape and related charges as a result of the sexual abuse of his then nine-year-old daughter during the summer months of 1989. He was sentenced to an aggregate term of fifteen to thirty years of imprisonment. A timely appeal was filed to this Court, which resulted in a remand for a new trial because this Court concluded that the testimony of Cindy Miele, a Children and Youth Services (CYS) caseworker, impermissibly infringed upon the province of the jury in that it bolstered the credibility of the child victim. *See Commonwealth v. Loner,* 415 Pa.Super. 580, 609 A.2d 1376 (1992).

¶ 3 In May of 1993, Appellant was convicted of soliciting the murder of Cindy Miele. A review of the certified record does not reveal the sentence Appellant received for this conviction.

¶ 4 Appellant's second trial on three counts of rape and related charges began on November 16, 1993. As its first two witnesses, the Commonwealth called the nurse and doctor who had examined the victim approximately one week after she was removed from the Loner household. These witnesses testified that their findings were consistent with the history reported to them by the victim and that, given the observation of the victim's broken hymen and enlarged vaginal opening, as well as other evidence of recent injury and scarring, the victim had been repeatedly penetrated by a fully developed male, within four to six weeks of the examination. The witnesses also noted the presence of venereal warts on the victim's anus, which they testified was consistent with direct sexual contact. Upon cross-examination by trial counsel, both witnesses conceded that they could not identify the perpetrator from their physical examination, but rather, had to rely upon the history as reported by the victim. In addition, it was conceded that a seventeen-year-old male could have caused the injuries to the victim.

¶ 5 The Commonwealth next called the victim, who by then was fourteen years of

age. The victim testified that she attended the seventh grade and lived with a foster family. She testified that, in 1989, she was in the second grade and lived with her parents and five siblings in a trailer. The victim further testified that, during the months of June and July of 1989, Appellant would call her to his bedroom, lay her down and sexually abuse her. She stated that Appellant would start touching her in her vagina and on her chest. She further testified that Appellant would get on top of her and try to have sex with her but the first two times he was unsuccessful because she yelled. The victim testified that Appellant had sexual intercourse with her "maybe twice." N.T., 11/16/93, at 73. The victim then testified about an incident in late July when Appellant got on top of her but she was "not sure he put his penis in my vagina that time" because someone came to the door. *Id.* at 76. She testified, however, that it happened about two times before this incident and that she would "yell stop," but that Appellant would cover her mouth. *Id.* According to the victim, Appellant told her that if she told anyone he would kill her mother and hurt her brothers and sisters. The victim testified that she was afraid of Appellant. She also testified that she was taken from the trailer on July 31, 1989.

¶ 6 On cross-examination by trial counsel, the victim testified that before the incidents happened, she and Appellant had a normal father/daughter relationship. She then stated that one of the days that Appellant penetrated her was the first day the police came to the trailer. The victim testified that, on this occasion, all of her brothers and sisters were home and that Appellant's bedroom door was open. According to the victim, her younger brother, Jimmy, told her that he had called the police. She testified that she did not tell her paternal grandmother of the abuse because Appellant was her son and her

grandmother may not believe her. The victim testified that she did not know who to tell, that she was only nine when the abuse occurred, and that she was scared. When asked who "Larry" was, the victim responded that he was a teenage neighbor who once laid her on the grass and gave her hickeys. Finally, upon cross-examination, the victim testified that she remembered writing a note to Appellant in the winter of 1990 in which she stated that she missed him and loved him. On redirect, the victim testified that she still loves Appellant.

¶ 7 The Commonwealth also called two police officers who investigated the allegations after receiving a complaint from a neighbor that Appellant "may have a problem with one of his children." N.T., 11/16/93, at 100. Upon cross-examination by trial counsel, Corporal Harold D. Goodwin of the Pennsylvania State Police identified the neighbor as a woman who placed the call after she overheard a conversation two of the Loner children were having with her grandson, Larry Cliber. The corporal further testified that he did not talk to Larry before going to the Loner household. As its final witness, the Commonwealth called Trooper John Buzard of the Pennsylvania State Police. Based upon statements the victim made to him during an interview at the offices of CYS, Trooper Buzard prepared an affidavit of probable cause to support the issuance of an arrest warrant. The trooper further testified that an attorney called the station on Appellant's behalf and asked what charges were going to be filed against Appellant. According to Trooper Buzard, the attorney told him that Appellant would turn himself in, but that Appellant was not to be subjected to questioning.

¶ 8 Upon cross-examination by trial counsel, Trooper Buzard testified that he spoke with the victim's mother who said

that the victim was a liar and concocted the story. In addition, the trooper testified that the victim did not tell him of the threats Appellant allegedly made to her in order to keep her from telling anyone about the abuse.

¶ 9 Based upon the victim's trial testimony, defense counsel demurred to one set of charges after the Commonwealth rested. The court heard argument from both counsel and the Commonwealth, but deferred ruling on the demurrer until the next day. The following morning the trial court denied Appellant's demurrer. The defense then gave its opening statement and began its case by calling Appellant to the stand.

¶ 10 Appellant testified that, due to a medical disability, he was a stay-at-home dad while his wife worked as a typesetter. He stated that her work hours fluctuated. Appellant then drew a floor plan of the trailer, described its dimensions as twelve by sixty foot, and marked where each of his children slept. He further testified that the walls in the trailer were thin and that you could overhear persons in other rooms. Appellant stated that the week before Corporal Goodwin came to the trailer he was never alone with the victim and that all six of his children were always inside the home. He further testified that each child had household chores to do in helping him maintain the residence. Appellant testified that he believed he had a good relationship with the victim. Appellant ended his testimony by stating that he never had sexual intercourse with the victim, or engaged in other inappropriate contact with her.

¶ 11 Upon cross-examination by the Commonwealth, Appellant discussed the chores that he asked his children to perform and stated that he never asked the victim to do more chores than the other children. He further testified that the victim would sometimes complain and go to her room instead of doing the chores. According to Appellant, on one occasion the victim told him that she hated him because he made her do too much housework.[1] Appellant conceded, however, that he did not have any reason to believe that the victim "was out to take any revenge against" him because of his "distribution of chores[.]" *Id.* at 20.

¶ 12 As its final witness, the defense called Jeremiah Loner, the victim's brother, who, in 1989, was twelve years of age. He testified that he was never afraid of Appellant, that there was no physical abuse, and that Appellant never threatened them. Jeremiah next testified that Larry Cliber was their neighbor and, in 1989, Larry was approximately sixteen or seventeen years of age. According to Jeremiah, in July 1989, he came upon Larry and the victim lying in the grass behind the trailer. Upon discovering the two, Larry jumped up and pulled his pants up. According to Jeremiah, the victim asked him, "What are you doing here[?]" N.T., 11/17/93, at 39. He stated that the victim did not appear upset, but "just a little shakey [sic]." *Id.* Jeremiah also stated that he accompanied the victim to the CYS offices and that he was giving his testimony for the first time because nobody else asked me or nothing." *Id.* at 46.

¶ 13 Upon cross-examination, Jeremiah testified that he believed Larry and the

---

1. The prosecutor also asked Appellant if he "previously testified" that every time the victim got angry she told him that she hated him for making her do housework. N.T., 11/17/93, at 19. Appellant testified that this behavior may not have occurred on every

occasion, but that he did not take it seriously because all she wanted to do was go outside and play. We note that Appellant does not include this reference by the Commonwealth in arguing that trial counsel was ineffective for failing to move for a mistrial.

victim were engaged in sexual intercourse. According to Jeremiah, he thought what they were doing was wrong, but he kept it secret. On redirect, Jeremiah testified that he did not tell his parents because he was afraid the victim would get in trouble. The defense then rested its case.

¶ 14 The Commonwealth called the victim in rebuttal. At that time, she testified that Jeremiah's testimony that he caught her and Larry Cliber having sexual intercourse in the woods was true. According to the victim, Larry grabbed her "and started doing stuff" to her. N.T., 11/17/93, at 61. The victim testified that Larry took off her pants and started putting hickeys on her and then had sexual intercourse with her "like [Appellant] did." *Id.* at 61. The victim then repeated that Appellant did the things to her that she had testified about during the Commonwealth's case-in-chief.

¶ 15 The court asked defense counsel if he wished to cross-examine, and trial counsel declined. The court then ordered a short recess and, upon the jury's return, defense counsel asked for a side bar discussion off the record. At an on-the-record side bar, trial counsel moved for a dismissal of the charges predicated upon the victim's rebuttal testimony. Trial counsel further stated that, if that motion was denied, he would move for a directed verdict. The trial court, after hearing further from trial counsel and the Commonwealth, denied the motion. Both defense counsel and the Commonwealth then presented their closing arguments to the jury. In his closing, trial counsel challenged the credibility of the victim: "she says it happened twice and she said my dad and [Larry Cliber] did it but look at the credibility of the child. I submit without condemning her that it doesn't exist." N.T. Closing Arguments, 11/17/93, at 6.

¶ 16 Upon concluding its jury instructions, the trial court asked the parties if there were any additions. At this time, defense counsel asked for a sidebar at which he renewed his "motion for directed verdict but particularly with respect to one set of counts as at best there is two counts of rape, two counts of the balance of the charges." N.T., 11/17/93, at 86. The trial court refused the motion "on the basis of what the Court Reporter was able to show us was actually testified to by [the victim]." *Id.* The jury retired for deliberations, ultimately returning with a verdict finding Appellant guilty of two counts of each of the above listed offenses. Following the dismissal of the jury and the court's explanation to Appellant of post-trial rights, trial counsel renewed the motion that he had made at sidebar with respect to a directed verdict or a judgment N.O.V., and he asked to orally file post-trial motions with respect to the weight of the evidence and its sufficiency. The trial court first responded by denying defense counsel's request for a directed verdict. The court then stated that the question of whether Appellant perpetrated the acts upon the victim was a matter of credibility for the jury. With regard to defense counsel's requests to file oral post-trial motions, the court suggested that the motions be written but assented to defense counsel's request to place some of his proposed issues on the record.

¶ 17 Subsequently, written post-trial motions were denied, and Appellant was sentenced to an aggregate term of thirteen to twenty-six years of imprisonment. On direct appeal, Appellant argued that there was insufficient evidence to support his convictions, or, alternatively, that the jury's verdicts were contrary to the weight of the evidence. A panel of this Court summarized Appellant's sufficiency claim as follows:

On appeal, [Appellant] argues that the only evidence of his guilt was the uncorroborated testimony of [the victim]. He suggests that the actual perpetrator of the abuse was the seventeen year old neighbor, whom the victim admitted having sexual intercourse with, and was observed doing so by her brother. This, [Appellant] asserts, combined with an insufficient investigation conducted by the police, rendered the Commonwealth's evidence insufficient, as a matter of law, to sustain his convictions. *Commonwealth v. Loner*, No. 610 Harrisburg 1995, unpublished memorandum at 4, 451 Pa.Super. 598, 678 A.2d 830 (filed March 12, 1996). In rejecting this claim, the panel quoted the trial court's opinion, which pointed out that Appellant's motion for directed verdict was correctly denied and that the testimony of a rape victim need not be corroborated to sustain a conviction. *Id.* at 5. The panel then concluded that a review of the record "discloses ample evidence to sustain [Appellant's] several convictions. The testimony of the victim, as corroborated by the medical evidence, was clearly sufficient to establish [Appellant's] guilt beyond a reasonable doubt." *Id.*

¶ 18 The panel further found that Appellant's weight claim was waived because he did not raise such a challenge in his post-trial motions. *Id.* at 6. Nevertheless, the panel found that there was "no basis for awarding Appellant a new trial on grounds that verdicts of guilty were contrary to the evidence" because "[a]ny conflict in the testimony of the witnesses was for the jury to resolve." *Id.* at 7. Appellant filed a petition for *allocatur* on April 8, 1996. This petition was denied on August 12, 1996.

¶ 19 On December 2, 1996, Appellant filed a *pro se* PCRA petition in which he raised several claims of trial counsel's ineffectiveness. By order dated December 18, 1996, the PCRA court appointed counsel and afforded Appellant thirty days to file an amended petition.[2]

¶ 20 An evidentiary hearing was held on September 4, 1997. Appellant was present along with current counsel. At this hearing, Appellant testified that the victim had recently written him three letters in which she stated that she wanted "to get [the] father and daughter relationship back, put the past behind her." N.T., 9/4/97, at 7. Appellant further testified that he did not know why the victim would testify that he raped her, but it was probably because she was mad at him because she hated him for making her do housework or because she wanted more things to play with. He also stated that CYS caseworkers gave her things she did not have at home and that the victim may have made the allegations against him in order to escape her living conditions. Appellant then discussed his allegations of trial counsel's ineffectiveness. Although given the opportunity, the Commonwealth did not cross-examine him. At the conclusion of the hearing, the PCRA court left the record open so the Commonwealth could determine if it wanted to call trial counsel. The Commonwealth called trial counsel as a witness at a second evidentiary hearing held on December 2, 1997. Counsel testified that he was court-appointed to represent Appellant both at Appellant's solicitation trial and at his second trial on the charges regarding the victim.

¶ 21 Upon cross-examination by Appellant's current counsel, trial counsel testi-

---

**2.** Counsel was appointed even though Appellant stated in his *pro se* petition that he was represented by present counsel. The order appointing counsel was later vacated. Order, 1/13/97.

fied that the case "all boiled down" to the issue of credibility. N.T., 12/2/97, at 10. Counsel testified that he did not take an overly aggressive stance with the victim because of the risk of engendering sympathy for her in the eyes of the jury. Counsel noted that Jeremiah testified that he never saw Appellant do anything inappropriate with the victim, the victim admitted having sexual intercourse with the teenage neighbor and that the time period in which the neighbor raped the victim corresponded with the medical testimony at trial. In sum, trial counsel testified that his main defense at trial was that the victim was only raped once by the teenage neighbor and that for some unknown reason she was shifting blame to Appellant. In support of this defense, counsel stated that he established a lack of opportunity on Appellant's part, given the presence of the other children, the living conditions within the trailer, and the fact that his wife's work hours fluctuated.

¶ 22 The PCRA court, by order dated July 28, 1999, granted Appellant twenty days in which to file an amended PCRA petition. Appellant's amended petition was filed on August 17, 1999. In addition to reiterating the ineffectiveness claims raised in his first petition, Appellant raised a claim that the victim had recently recanted her trial testimony. The Commonwealth filed a motion to dismiss the amended petition, which was denied by the court by order dated March 17, 2000.[3]

¶ 23 The court heard arguments of counsel with regard to the amended petition on November 7, 2000. The amended petition was denied by opinion and order dated May 2, 2001. This timely appeal followed,

in which Appellant raises the following issue: "Should Appellant be granted a new trial based on ineffective assistance of counsel and victim's recantation?" Appellant's Brief at 6. Our standard of review for an order granting or denying post-conviction relief is limited to examining whether the court's determination is supported by evidence of record and whether it is free of legal error. *Commonwealth v. Cobbs*, 759 A.2d 932, 934 (Pa.Super.2000). With this standard in mind, we first shall review Appellant's claims of ineffective assistance of trial counsel.

¶ 24 To obtain relief under the PCRA premised upon a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Payne*, 794 A.2d 902, 905 (Pa.Super.2002), *appeal denied*, 570 Pa. 685, 808 A.2d 571 (2002) (citing 42 Pa.C.S.A. § 9543(a)(2)(ii)). This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. *Id.* at 905–06. The law presumes that counsel was effective, and it is the petitioner's burden to prove otherwise. *Id.* at 906. Counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Id.*

¶ 25 Trial counsel's strategic choices cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonably based and was not the result of sloth or

---

**3.** The Commonwealth moved to dismiss the amended petition because it was not filed within sixty days of Appellant's discovery of the victim's recantation. *See generally* 42 Pa. C.S.A. § 9545(b). The court rejected the

Commonwealth's argument because Appellant amended a petition that was still pending, rather than filing a second PCRA petition after the denial of the first.

ignorance of available alternatives. *Commonwealth v. Collins*, 519 Pa. 58, 65, 545 A.2d 882, 886 (1988) (cited with approval by *Commonwealth v. Hall*, 549 Pa. 269, 297, 701 A.2d 190, 204 (1997)). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Ervin*, 766 A.2d 859, 862–63 (Pa.Super.2000), *appeal denied*, 568 Pa. 627, 793 A.2d 904 (2002), *cert. denied*, 536 U.S. 939, 122 S.Ct. 2620, 153 L.Ed.2d 803 (2002). Furthermore, counsel's effectiveness cannot be evaluated in hindsight but must be examined in light of the circumstances as they existed at the pertinent time. *Commonwealth v. Hardcastle*, 549 Pa. 450, 464, 701 A.2d 541, 547 (1997).

¶ 26 Counsel will not be deemed ineffective if any reasonable basis exists for his or her actions. *Commonwealth v. Douglas*, 537 Pa. 588, 597, 645 A.2d 226, 231 (1994). Even if counsel had no reasonable basis for the course of conduct pursued, a defendant is not entitled to relief if he fails to demonstrate "prejudice" as that element is defined under Pennsylvania's ineffectiveness standard. *Id.* at 599, 645 A.2d at 232. In assessing a claim of ineffectiveness, when it is clear that the defendant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone without any further determination. *Commonwealth v. Travaglia*, 541 Pa. 108, 118, 661 A.2d 352, 357 (1995).

¶ 27 The PCRA court addressed the following claims of trial counsel's ineffectiveness: 1) arguing that Appellant was not guilty because the victim admitted she had sexual relations with a teenage boy during the same time period; 2) for not arguing there was insufficient evidence; and 3) for not requesting a cautionary instruction and/or making a motion for mistrial when the Commonwealth made reference to a prior trial.[4] We shall address these claims individually.

¶ 28 In disposing of Appellant's first claim, the PCRA court concluded that:

> It was not unreasonable for counsel to shift blame for the crime by suggesting to the jury it was a teenage boy who had sexual relations with the victim, not [Appellant]. The victim admitted she had sex with her neighbor, a teenage boy, during the time period in question. Such activity would explain the victim's broken hymen. Although this argument was unsuccessful, it had some reasonable basis.

PCRA Court Opinion, 5/3/01, at 3.

¶ 29 The essence of Appellant's argument on appeal with regard to this claim is that trial counsel focused on this defense to the exclusion of all others. In support of this claim, current counsel suggests other trial strategies, most notably "the very obvious defense that this alleged victim of young years may have been influenced into fabrication or exaggeration to please the [CYS] workers." Appellant's Brief at 10. Admittedly, trial counsel did appear to argue to the trial court, both at a side bar prior to his convictions and after the jury was dismissed, that, because Larry Cliber raped the victim, Appellant could not have done so. Moreover, on direct appeal, trial counsel included such a claim as part of his challenge to the sufficiency of the evidence. A detailed review of the trial transcripts, however, refutes Appellant's present claim.

■ ¶ 30 Our review reveals that trial counsel first established, via cross-exami-

---

4. Throughout the more than thirty-five pages of argument in his brief, Appellant raises several additional claims of trial counsel's ineffectiveness. Oral argument on Appellant's amended petition was not transcribed. We assume the claims then addressed by counsel are the ones addressed by the trial court. Thus, we will limit our review to these claims.

nation of the medical witnesses, that a teenage boy could have caused the victim's broken hymen and that the medical exam could not determine the identity of the abuser. Additionally, trial counsel established a lack of opportunity on Appellant's part to perpetuate the abuse because of several factors, including the confines of the small trailer, the presence of the other children, and the fact that his wife's hours of employment fluctuated. Moreover, trial counsel elicited testimony from a police officer that the victim's mother said the victim concocted the story and also produced evidence that the victim may have had a motive for blaming Appellant for the abuse because she hated him for having to do chores. Finally, although trial counsel recognized that the victim's credibility was *the* issue in the case, he chose not to vigorously cross-examine her, believing such a tactic would engender jury sympathy for her. These strategies, when coupled with the victim's admission of having been abused by another person during the same time period, provided Appellant a reasonable trial strategy. The fact that it was unsuccessful, or in hindsight could have been more effectively argued, does not render counsel deficient. *Commonwealth v. Rizzuto*, 566 Pa. 40, 68, 777 A.2d 1069, 1086 (2001); *Hardcastle, supra.*

¶ 31 Appellant next claims that trial counsel was ineffective for not raising a sufficiency of the evidence claim in that the victim's testimony did not establish the elements of the offenses for which he was convicted. As noted above, a sufficiency claim was raised on direct appeal, albeit on somewhat different bases, and disposed of by this Court. *See Loner, supra,* memorandum at 5. Thus, as this claim was previously litigated, we need not address it further. 42 Pa.C.S.A. § 9544(a)(2). *See also Commonwealth v. Williams*, 573 Pa. 613, —— n. 6, 828 A.2d 981, 985 n. 6 (2003)

(citing *Commonwealth v. Morales*, 549 Pa. 400, 411, 701 A.2d 516, 521 (1997)) (explaining that post-conviction relief on claims previously litigated is not available by alleging ineffective assistance of counsel).

¶ 32 In his final claim of ineffectiveness, Appellant asserts that trial counsel was ineffective for failing to request a cautionary instruction or to move for a mistrial once the Commonwealth referenced Appellant's first trial during the victim's testimony. We cannot agree.

¶ 33 At trial, after the victim testified that penetration occurred "maybe twice," the prosecutor asked her whether she had testified in an "earlier trial" that Appellant had sexual intercourse with her on three occasions. N.T., 11/16/93, at 73. Appellant's trial counsel objected to the reference to Appellant's prior trial and requested a cautionary instruction. The trial court sustained the objection and stated that it would not give a cautionary instruction, but that defense counsel "could bring it up later." N.T., 11/16/93, at 74. The court revisited the issue after it gave its instructions to the jury. The court again explained its belief that a cautionary instruction at the time the Commonwealth made the brief reference would have only served to highlight the fact that a prior trial occurred. Additionally, the court opined that such an instruction as part of its jury charge would once again highlight this fact and perhaps confuse the jury. Defense counsel concurred with the trial court's suggestion, and no further instruction was given.

¶ 34 At the evidentiary hearing, trial counsel could not recall why he did not move for a mistrial. In its opinion, the PCRA court found that counsel's request for a mistrial would have been frivolous because, while this brief reference was made, it did not include the fact that Appellant had been convicted. We agree.

*See Commonwealth v. Topa,* 269 Pa.Super. 473, 410 A.2d 354, 357 (1980); *see also Commonwealth v. Wallace,* 555 Pa. 397, 410–11, 724 A.2d 916, 923 (1999). Moreover, we agree with the trial court's conclusion regarding the probable effect that a cautionary instruction would have had on the jury. Thus, trial counsel cannot be deemed ineffective for failing to pursue this meritless claim. *Payne, supra.*

¶ 35 In his final claim on appeal, Appellant asserts that the PCRA court should have granted him a new trial based upon the victim's recantation testimony. After noting that recantation testimony is highly unreliable, and that it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true, *Commonwealth v. Coleman,* 438 Pa. 373, 377, 264 A.2d 649, 651 (1970), the PCRA court stated that it was not satisfied that the victim's recantation testimony was true because her explanation for lying at both trials was not reasonable.

¶ 36 Section 9543(a)(2)(vi) of the PCRA provides for post-conviction relief when a petitioner can prove a claim of newly discovered evidence. *Commonwealth v. Fiore,* 780 A.2d 704, 711 (Pa.Super.2001), *appeal dismissed,* 572 Pa. 568, 817 A.2d 1080 (2003). In order to succeed with this claim, "the petitioner must establish by a preponderance of the evidence that: (1) the evidence has been discovered after the trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) such evidence is not cumulative; (3) the evidence is not being used solely to impeach credibility; and (4) such evidence would likely compel a different verdict." *Id.* (citing *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 517, 720 A.2d 79, 94 (1998)).

¶ 37 Our Supreme Court has summarized appellate consideration of a claim involving recanted testimony as follows:

The well-established rule is that an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion.... Recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. There is no less reliable form of proof, especially when it involves an admission of perjury.

*Commonwealth v. Mosteller,* 446 Pa. 83, 88–89, 284 A.2d 786, 788 (1971) (quotations and citations omitted). A prerequisite to such relief is that "the evidence upon which the relief is sought must be credible to the trial court." *Commonwealth v. Lee,* 478 Pa. 70, 74, 385 A.2d 1317, 1319 (1978); *see also Commonwealth v. Nelson,* 484 Pa. 11, 14, 398 A.2d 636, 637 (1979) ("It is up to the trial court to judge the credibility of the recantation."); *Commonwealth v. Fernandez,* 232 Pa.Super. 19, 332 A.2d 819, 821 (1974) (explaining that "credibility is the key when a new trial is sought on the basis of recanted testimony"). This is so because the PCRA court "had ample opportunity to observe [the victim's] manner and demeanor during a full evidentiary hearing." *Commonwealth v. Gaddy,* 492 Pa. 434, 438, 424 A.2d 1268, 1270 (1981); *see also Commonwealth v. Simpson,* 302 Pa.Super. 287, 448 A.2d 640, 642 (1982) (explaining that "[t]he hearing judge was in a much better position than we are to evaluate the demeanor and credibility of the witnesses"); *Commonwealth v. Bernstein,* 309 Pa.Super. 573, 455 A.2d 1232, 1234 (1983) (remanding case for trial court's determination of credibility of recantation testimony).

¶ 38 Appellant claims that our Supreme Court's decision in *Mosteller, supra,* mandates a new trial in this case. We cannot

agree. In *Mosteller*, on June 13, 1968, a jury convicted the defendant of incest, statutory rape, and corrupting the morals of a minor with regard to his fifteen-year-old daughter. According to the victim's testimony at trial, on January 23, 1968, her father penetrated her for five minutes, she experienced no pain, and no emission occurred.

¶ 39 The victim testified that she then dressed and went downstairs while her father went to sleep. According to the victim, about fifteen minutes later, when her sister returned from school, she told her of the alleged incident, and the victim repeated the story to her mother shortly thereafter. The next day, the victim's stepbrother and his wife, having heard of the accusation, took the victim from her school and to the local police, who in turn had her examined at the hospital.

¶ 40 The examining physician testified for the Commonwealth at trial. The doctor testified that his examination of the victim on January 24, 1968, "disclosed no evidence of perineal or labial laceration; her hymen was intact and uninjured. A vaginal cotton swab test and a rectal examination were also negative." *Mosteller*, 446 Pa. at 86, 284 A.2d at 787. The victim's mother testified for the defense. She stated that after she was informed of what had allegedly occurred, she took the victim into the bathroom and examined her, at which time she "seen everything normal." *Id.* She also testified that upon returning home on the day of the incident, the victim was sitting downstairs and in no way appeared disturbed or upset. The defendant testified on his own behalf and strongly denied having done any of the acts attributed to him by the victim. The defendant admitted being alone with the victim on the day of the alleged incident, but asserted that he had been asleep the entire time.

¶ 41 The victim returned to live with her parents shortly after the alleged incident occurred. She remained there until May 1, 1968, when she was adjudged a dependent child. Protective services were ordered and the victim was instructed to live with her maternal grandmother, with whom she stayed until June 25, 1968 (thirteen days after the jury's verdict). Two days later, the victim's sister telephoned their father's attorney and informed him that the victim wished to retract her trial testimony.

¶ 42 On June 17, 1968, the defendant filed a motion for new trial based upon after-discovered evidence. The victim was examined by the district attorney in the presence of defense counsel and a representative of the Children's Bureau on June 28, 1968. At that time:

> She stated under oath that her testimony at trial had been untrue, and stressed, " . . . [h]e did not do it, and I don't want to see him go to jail for something he didn't do, and I want to be home with my parents." Her explanation for her earlier falsehoods was, " . . . [b]ecause people was telling me to do one thing and other people were telling me to do another thing, and I was so mixed up I didn't know what to say." According to [the victim] her grandmother and her uncle had pushed her into testifying at trial. She had merely told her sister that "my father got after me," and her sister then relayed this information to their mother. She was scared to tell the truth at trial because her " . . . grandmother and them was in court, and if I turned around and told the other story, that he didn't touch me, then I didn't know what they would think."

> [The victim] continued by persistently denying every aspect and detail of her previous trial testimony despite numer-

ous warnings from the district attorney that she was in effect admitting the crime of perjury, which, it was explained to her, carried a penalty "of up to $3,000 fine and up to seven years in jail." [The victim] did not waiver in her recantation. *Mosteller*, 446 Pa. at 87–88, 284 A.2d at 787.

¶ 43 A later hearing was held before the trial court on February 3, 1969, at which time the victim's great aunt testified that on May 14, 1968 (approximately one month prior to the defendant's trial), she had asked the victim if her father had actually done anything at all to her, and the victim replied that he had not. She further explained that she had not made the fact known previously because her brother had instructed her to remain quiet.

¶ 44 Sitting *en banc*, the trial court determined that a new trial was not warranted under the circumstances. This Court affirmed, per curiam, without an opinion, with the late Judge Sydney Hoffman dissenting. *Commonwealth v. Mosteller*, 216 Pa.Super. 236, 263 A.2d 768 (1970). Our Supreme Court then granted *allocatur*.

■ ¶ 45 After noting the above requirements for a new trial based upon after-discovered evidence and its general view of recantation testimony, the high court noted:

> [W]e have not previously been presented with precisely the factual situation that now confronts us. [The victim] gave the *only* testimony which could possibly have led to appellant's conviction. Not an iota of other corroborating evidence was offered. To the contrary, the testimony of [the victim's] mother and the medical evidence support appellant's

version of the incident and the recantation testimony. Furthermore, [the victim's] retraction was corroborated by her great aunt.

> We are in accord with the court en banc and Judge Hoffman's dissent that [the victim's] deposition of June 28 constituted after discovered evidence. It was not available until after the trial, it was not merely corroborative, it will not be used for mere purposes of impeachment, and it unquestionably is of such character as to probably result in a different verdict if a new trial is held.

*Mosteller*, 446 Pa. at 89, 284 A.2d at 788.[5] Thus, our Supreme Court concluded that it was a clear abuse of discretion not to award a new trial under the circumstances and "allow a new jury to pass on the child prosecutrix's credibility." *Id.*

¶ 46 In reaching this determination, our Supreme Court emphasized that its decision should not be viewed as altering the established rule that uncorroborated testimony of the victim can be sufficient to sustain a conviction of rape. Nevertheless, the Court concluded that "where as here the defendant's conviction is based completely on testimony of the child prosecutrix *and the truth of that testimony is open to serious question because of the testimony of a disinterested medical witness*, a subsequent recantation of testimony as supported by this record necessitates a new trial." *Id.*, 446 Pa. at 90, 284 A.2d at 789 (emphasis added).

¶ 47 Finally, in *Mosteller*, our Supreme Court noted that this Court reached the same result in a "remarkably analogous situation" in *Commonwealth v. Krick*, 164 Pa.Super. 516, 67 A.2d 746 (1949). In *Krick*, the defendant went to board at the

---

**5.** In view of these comments, and despite *dicta* supporting its claim in *Commonwealth v. McClucas*, 378 Pa.Super. 202, 548 A.2d 573, 576 (1988), we reject the Common-

wealth's assertion that the victim's recantation in this case is not truly after-discovered evidence because Appellant knew prior to trial that the victim was not telling the truth.

home of the victim's parents in October 1946. Approximately two months later, he was accused of entering the twelve-year-old victim's bedroom and having sexual intercourse with her. This defendant engaged in such conduct again in April of 1947. In May of 1947, the defendant left the victim's parent's home and went to another boarding house. Two days later, the victim's mother left the marital home and took a room at the same boarding house. Three days after her mother left to join the defendant, the victim accused the defendant of the assaults. Slightly more than two weeks after a trial, which resulted in the defendant's conviction for the statutory rape of the victim, however, the victim recanted, stating that her father told her to give false testimony, which she did out of revenge for the mother's leaving the family home. In a unanimous decision, this Court found that the victim's letter and affidavit "not merely impeach[ed] but completely destroy[ed] and obliterat[ed] the testimony of the one witness upon whose testimony the defendant was convicted.... In the absence of sworn evidence impeaching the girl's retraction, a new trial should have been granted." *Krick*, 67 A.2d at 749.[6]

¶ 48 Applying this holding to the facts before it, our Supreme Court in *Mosteller* noted:

not only is there nothing to contradict [the victim's] recantation, there is evidence from her great aunt that [she]

admitted a month prior to trial that she had fabricated her story. Additionally, [the victim] persisted in her retraction despite having been informed that she was thereby subject to criminal charges for perjury and a substantial prison term. This was a clear declaration against penal interest entitled to considerable credibility, unlike the normal retraction by a co-conspirator who is already in prison and realistically has little to lose by attempting to free his partner.

*Mosteller*, 446 Pa. at 91, 284 A.2d at 789.[7]

¶ 49 Unlike the circumstances presented in *Mosteller*, the truth of the victim's testimony at Appellant's second jury trial in this case is not open to serious question because the testimony of the "disinterested" medical witnesses was completely consistent with the victim's claim of sexual abuse. In addition, the victim's recantation testimony in this case was not supported by testimony from other witnesses who had learned of her fabrication prior to trial.

¶ 50 In *Commonwealth v. Thompson*, 271 Pa.Super. 170, 412 A.2d 630 (1979), this Court, in a panel decision written by Judge Hoffman, found that the trial court did not abuse its discretion in refusing to grant a new trial after the young complainant recanted her trial testimony that the defendant had raped her. In *Thompson*, the defendant's eleven-year-old stepdaughter testified that the defendant took her to the home of a third person, forced her to

6. This Court's reference to the need for "sworn evidence" impeaching the victim's retraction relates to its conclusion that the trial court abused its discretion in refusing the motion for new trial based upon an out-of-court statement made to the trial court by its neighbor, who allegedly overheard the victim's mother threaten suicide if the victim refused to recant her testimony in court. *Krick*, 67 A.2d at 748.

7. In his dissent, which was joined by Chief Justice Bell, Justice Pomeroy opined that, because the trial court was not satisfied that the victim's recantation was true and that the motive for it was apparent, *i.e.*, to live again with her parents, he could not conclude that the trial court committed a clear abuse of discretion by denying the motion for new trial. *Mosteller*, 446 Pa. at 94, 284 A.2d at 791 (Pomeroy, J., dissenting). Justice Barbieri also noted his dissent.

enter a bedroom, pushed her onto a bed, pulled down her pants and raped her. She further testified that when she later went to the kitchen, the defendant and the third person forced her to lie on the floor and each touched her vagina. According to the victim, the defendant threatened to kill her if she told anyone about the incident. Twelve days later, the victim reported the incident to her mother, who alerted the police.

¶ 51 Based upon this testimony, the defendant was convicted by the trial court, sitting without a jury, of rape and related charges. Approximately two weeks later, the victim wrote a card to her mother asserting that she lied at trial. Based upon this evidence, the defendant filed a motion for a new trial. At a subsequent *in camera* hearing, the victim confirmed her trial testimony in all respects, except that she then claimed that the defendant had not raped her but had only exposed himself after forcing her down on the bed and removing her pants. The victim further informed the trial court that she would not lie to help her stepfather get out of jail, but admitted that she loved him, knew that her mother, sister and brothers were angry with her because of her trial testimony, and wished to recant in order to mollify her family. Concluding that the victim had testified truthfully at trial, the trial court denied the defendant's request for a new trial. In so finding, the trial court considered the general principle that recantation testimony is unreliable and that the victim was motivated and under pressure to lie at the *in camera* hearing.

¶ 52 Determining that the trial court's decision did not constitute a clear abuse of discretion, Judge Hoffman wrote:

> Particularly in view of appellant's threat against her life, she had no apparent motive to testify falsely at trial but did have a clear motive to testify falsely at the recantation hearing. Moreover, her trial testimony was not contradicted by medical findings. The trial court did not err in rejecting [the victim's] second version of the crime.

*Thompson*, 412 A.2d at 631–32.

¶ 53 After a thorough review of the record in this case, we conclude that the circumstances surrounding the victim's recantation testimony is more akin to the facts and discussion in *Thompson* rather than *Mosteller* or *Krick*.

¶ 54 Here, the victim, then eighteen years of age and living with her brother, gave a telephone deposition on April 30, 1998, which was recorded at the offices of Appellant's counsel. In this deposition, the victim testified that, at the time of the alleged incidents, she was happy living at home and when she was taken away she was upset. She testified that Appellant never did anything wrong to her. With regard to the CYS workers, the victim testified that they brought anatomically correct dolls in and were showing her stuff with the dolls. The victim testified that, "they were showing me stuff with the dolls.... They kept on saying, this is what happened, isn't it. This is what happened. And I wouldn't say nothing. And eventually I just said yes." N.T., 4/30/98, at 6, 7.

¶ 55 When asked why she said yes if it wasn't true, the victim stated, "Because I was tired of them keep on going about it. I mean, I was there a lot of hours, and I was just getting tired of it. I just gave in; I just said yes." *Id.* at 7. The victim further testified that, subsequent to the second trial, she never tried to tell CYS or anyone else that what she said at trial was not true because "they were pressuring me into something. I believed what they were saying was true, so I never brought it up to them." *Id.* at 9–10. When Appellant's counsel asked her why she now chose to recant her trial testimony, the victim stat-

ed, "Because I feel that with my dad in jail, he don't belong in there, and that he didn't do nothing wrong to me there, and I want my family back together." *Id.* at 10. Nevertheless, the victim testified that her desire to reunite her family was not the reason she came forward, but rather, that she wanted to tell the truth. The victim further testified that no one attempted to influence her to recant and that she had "been wanting to do this for a long time." *Id.* Finally, in her deposition the victim stated:

I'm the one that wanted to do this. I thought it was right because I hurt so many people now. I just want to tell my side. I'm older, I can do that without being scared that anybody is going to do anything to me or without anybody pressuring me.

I am not in [CYS care] no more. I'm my own person, and I can make decisions on my own. And this is what I want to do.

N.T., 4/30/98, at 11.

¶ 56 Subsequently, the victim testified before the trial court on December 8, 1999. At this time, the victim was twenty years of age. She testified that, over the years, she and her paternal grandmother would visit with Appellant at the prison about once or twice a month. The victim then testified that she told the truth in her May 1998 deposition and that she did not wish to change anything she stated at that time. She also stated that her testimony in the earlier trials was not true. When asked if she recalled what she testified to "back then," she stated, "I don't remember all of it. It's been a long time but I do remember that I have lied in the past, yes." N.T., 12/8/99, at 21. She then stated that her earlier testimony that Appellant had intercourse with her and raped her was not true. When Appellant's counsel told her that she had "to give the Court and us an

explanation of why would you make statements like that back then if they weren't true," the victim responded:

I was taken out of my home when I was nine and I was taken to the Children and Youth Office and there was, my old case worker was there and a couple of police officers and they kept on asking me questions and questions I didn't say nothing.

I didn't say nothing for a long time and I was getting really tired of being there and stuff and they kept asking me questions and they brought in these dolls. They kept asking me and showing me, he done this, he done that and I just got tired of it and I gave in and I went through therapy and stuff and they kept saying stuff in my head and I was young and it just sank in I guess and I started believing what they were telling me.

That's what happened. That's why I said yes to everything back then. But as I got out of foster care and I wanted to do this for years but I couldn't because I was in Children and Youth and they wouldn't believe me then. So, I though when I got out I can say it and I did.

N.T., 12/8/99, at 22–23. The victim also acknowledged that she saw Appellant during the trials in this case and wanted to tell the truth "many a times because it ruined our family." *Id.* at 23. Finally, the victim acknowledged that she was under oath and that she was admitting her earlier testimony was false.

¶ 57 The court then asked her if, when she testified at trial, she believed that her testimony was true. The victim responded, "In a way, yes, and in a way not because over the years that's all I heard." *Id.* When the trial court again asked her "[a]s best you can remember today did you believe what you were saying at trial was

true," the victim replied in the negative. She then acknowledged that she was lying during her trial testimony. When the court asked her why she just did not admit at trial that what she was saying was not true, the victim responded:

> Because I was scared what was going to happen to me when I went back home, when I got to see, when [Cindy Miele] would come and talk to me I was scared what they were going to say to me and stuff.

*Id.* at 25. The victim again acknowledged that she was under oath and sworn to tell the truth. The victim informed the court that, at the time of the hearing, she understood what that meant. She further testified that she knew what that meant at the time of the trial, and she knew that she lied. When the court asked the victim if caseworkers from CYS or anyone threatened her that she would be hurt or punished if she did not testify the way she did at trial, the victim responded:

> They didn't threaten me but just what they would say to me and how they would say you know he done this and you know he done that and all the counselors they were saying you know he done this and they were showing me all these dolls and stuff. So, I just said, yes, because I was scared. I didn't know what they would do. They didn't come out and threaten me but it was like more or less I thought they would.

N.T., 12/8/99, at 26.

¶ 58 Upon cross-examination by the district attorney, when asked if she had testified consistently at the preliminary hearing, the first trial and the second trial, the victim replied that she could only remember testifying twice. She then acknowledged that when she gave her telephone deposition in May 1988, she was at the home of her paternal grandmother, *i.e.,* Appellant's mother. The victim then testi-

fied that, after leaving the care of CYS, she first lived with her older brother at several addresses and that she was currently living in her own apartment, but that her brother was living with her.

¶ 59 On redirect, the victim testified that she was nine years old at the time of the alleged incidents and ten years of age when she testified at Appellant's first trial. Despite this young age, however, she knew what "sex" was and admitted that, as trial counsel brought out at her second trial, she had had sex with Larry Cliber. Thus, according to the victim, she "didn't really need these dolls that they were showing" her. *Id.* at 29. Finally, she stated that Appellant never did the things Larry did to her.

¶ 60 "The deference normally due to the findings of the [PCRA] court is accentuated where what is involved is recantation testimony[.]" *Lee,* 478 Pa. at 75, 385 A.2d at 1320; *Gaddy, supra.* In the present case, the trial court was not satisfied the victim's recantation testimony was true. As in *Thompson,* the victim's trial testimony included the allegation that Appellant had threatened to harm her mother and/or siblings if she told anyone of the abuse, and her recantation testimony, which occurred approximately five years after the second trial in this case, revealed a motive to lie, *i.e.,* the reunification of her family. *See also Commonwealth v. McCloughan,* 279 Pa.Super. 599, 421 A.2d 361, 365 (1980) (affirming denial of new trial based upon sexual assault victim's recanted testimony when, *inter alia,* the evidence produced at hearing revealed that the victim had not changed her story until she began dating the son of the defendant's girlfriend). The victim's testimony that she was influenced by CYS caseworkers was for the PCRA court, who also presided over Appellant's second trial, to accept or reject. Because we cannot conclude that the PCRA court

clearly abused its discretion in denying Appellant a new trial based upon after-discovered evidence, we affirm the order of the court below denying Appellant post-conviction relief. *Mosteller, supra,*

¶ 61 Order affirmed.

¶ 62 KLEIN, J. files a Dissenting Opinion.

KLEIN, J., Dissenting.

¶ 1 I must respectfully dissent from the majority in this case. I would remand the case to the trial judge for a fuller explanation as to why he discredits out of hand the recantation of the victim. Her testimony was the only testimony to prove that the *defendant* as well as the *neighbor* had sex with her. While there was independent medical evidence that the victim had had sex with *someone,* once she admitted having sex with the seventeen-year-old neighbor boy during the time period in question, all the other evidence was just as consistent with her having sex only with the neighbor. Therefore, only her testimony, not confirmed by any other witness, was responsible for the conviction.

¶ 2 Looking at the cold record, justice and the Supreme Court case of *Commonwealth v. Mosteller,* 446 Pa. 83, 284 A.2d 786 (1971) require a new trial. Perhaps there was something in the demeanor of the witness that would indicate that a new trial, despite her recantation, would make no difference and Loner would still be convicted. The trial judge is exceptionally able and experienced, and has a well-deserved reputation as one of the Commonwealth's outstanding jurists. Therefore, I recognize that if he made a full explanation as to *why* he dismissed the recantation and if he gave reasons why he did not think the outcome would change absent the victim's trial testimony, it would be difficult to refute his argument. However, that is not what the judge did in this case. Perhaps because he was concentrating on other issues, he dismissed in two sentences what appears to be newly-discovered evidence that would change the outcome of a trial.

¶ 3 The entire discussion in the judge's opinion is the following:

The Court is not satisfied the victim's recanting testimony is true. Her explanation for lying was not reasonable.

Trial Court Opinion and Order, p. 5.

¶ 4 It does not matter whether the *trial court* believes or disbelieves the recantation. The test is whether for some reason the recantation would not have likely affected the outcome of the trial. *Commonwealth v. Fiore,* 780 A.2d 704, 711 (Pa.Super.2001), *appeal dismissed,* 572 Pa. 568, 817 A.2d 1080 (2003) (citing *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 517, 720 A.2d 79, 94 (1998)); *see also Mosteller, supra.* At the *first* trial, it is probable that there would have been a judgment of acquittal without the victim's testimony. The only reason the trial judge gives for dismissing the recantation is that "[h]er explanation for lying was not reasonable." While the trial judge may not *believe* the recantation for some reason not known to us, the explanation as to why a nine-year old might have lied *is* reasonable. She had been having sex with a seventeen-year-old neighbor, which she well could have known was wrong. This was not revealed to anyone until the trial.

¶ 5 At trial, the victim's twelve-year-old brother testified that in July 1989, he came across his sister, the victim, and the seventeen-year-old neighbor in a wooded area after they had had sexual intercourse. (N.T. Jury Trial, 11/17/93 at pp. 38–39.) The victim's brother testified that he did not tell his parents because he did not want to get his sister in trouble. (*Id.* at pp. 53–54.) The Commonwealth recalled the victim on rebuttal, who admitted that

she had had sexual intercourse with the neighbor at that time. Neither the victim nor her brother informed CYS of this. That might explain why others thought her father was the one abusing her; there was physical evidence that the victim had had sexual intercourse, but no information about the neighbor until the defense brought it up at trial. It is also noteworthy that at the PCRA hearing on December 2, 1997, defense attorney R. Bruce Manchester recalled the brother's statement that he had witnessed his sister being raped by "the individual that was one of the people that reported the rape of, the alleged rape [by] Mr. Loner of his daughter." (N.T. PCRA Hearing, 12/2/97 at p. 6.)

¶ 6 The victim testified that she was taken from her home by CYS in July 1989, shortly after the alleged abuse, and that CYS pressured her into saying her father was the one that committed that act, and that she eventually started to believe it herself. (N.T. PCRA Hearing, 12/8/99 at pp. 22–24.) She remained committed to CYS for many years, and did not want to antagonize the people that had control over her by saying that she had lied. She also stated that she knew at the time of trial that she was lying, but that at that point she was afraid of "what was going to happen to me when I went back home[.]" (*Id.* at p. 25.) Considering the victim's age and background, whether or not her statements were true, her explanation for lying is certainly not "unreasonable."

¶ 7 Accordingly, I would at least remand this matter to the PCRA judge, who was also the judge at both trials, to allow him the opportunity to say why testimony that appears to justify a new trial does not justify a new trial.