J-S29017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| HENRY RICKY LANZ | |
| Appellant | No. 1134 WDA 2015 |

Appeal from the PCRA Order July 21, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0002519-2007

BEFORE: BENDER, P.J.E., PANELLA, J., and FITZGERALD, J.[*]

MEMORANDUM BY PANELLA, J.: **FILED JUNE 14, 2016**

Appellant, Henry Ricky Lanz, appeals from the order dismissing, without a hearing, his petition pursuant to the Post Conviction Relief Act ("PCRA"). Lanz argues that the PCRA court erred in denying him a hearing on his claims of trial counsel ineffectiveness. After careful review, we conclude that the PCRA court did not err, and therefore affirm.

The history surrounding the convictions underlying Lanz's PCRA petition were set forth by this Court previously in reviewing his direct appeal.

> Lanz and the victim, Paula Lanz, were married and had two children together. At the time of Paula's disappearance on January 28, 2007, the couple had been separated for some time. Paula had an active Protection From Abuse order against Lanz, and was seeking a divorce. Paula was living in the marital

_____

[*] Former Justice specially assigned to the Superior Court.

residence, while Lanz was living in a second separate residence that the couple had been in the process of purchasing. The couple had been having a disagreement over the disposition of the second residence in the divorce.

On the afternoon of January 28, 2007, Lanz and his two daughters were at the home of a neighbor, Tina Aubrey. Aubrey overheard Lanz and Paula arguing and heard Paula ask Lanz to bring the children to the local Wal-Mart at 6:00 pm to exchange custody. While Aubrey was speaking with Lanz on the phone later that evening, she overheard the children in the background. When asked why the girls were not with their mother, Lanz responded that Paula had to leave town at the last minute for business and had left the children with him. Paula was never seen alive again after January 28, 2007.

On January 31, 2007, Aubrey called the police and told Sergeant Paul Abel that she had not seen or heard from Paula in several days, and that she thought something might have happened to her. Sergeant Abel called Paula's phone several times, but nobody answered. He then contacted Lanz and informed him that a friend of Paula's had contacted him expressing concern about Paula's disappearance. Lanz again repeated his story that Paula was away on a business trip, and stated that he had spoken with her the night before. Sergeant Abel then contacted Paula's mother, who said she had not heard from Paula in several days, and Paula's supervisor, who said that the victim would have no reason to leave town on a business trip. Paula's supervisor also said that he had tried to contact Paula several times, but his text and voice messages were not returned.

Anthony Perry, a detective with the county homicide unit, interviewed Lanz on February 1, 2007. Lanz told Detective Perry that he had turned the children over to Paula as planned on the evening of January 28th, but that she called him later that night and asked him to watch the kids because she had to leave early the next morning for a business trip. Lanz claimed that he had spoken with Paula on Monday and Tuesday evening, and that both times Paula had told him she had to stay longer on her trip. Lanz claimed that he did not report Paula missing because he thought he had to wait 48 hours before he could file a missing persons report.

Lanz accompanied Detective Perry to the police station to complete the interview, where he consented to a search of his residence, the residence he had shared with his wife, and his vehicle. When Detective Perry discovered that Lanz was subject to an active PFA order that barred him from his wife's residence, he placed Lanz under arrest for violating the order. Detective Perry also issued a nationwide alert to law enforcement authorities to be on the lookout for Paula and her vehicle. A short time later, law enforcement authorities in Nashville, Tennessee, called and reported that they had found Paula's vehicle burning in a parking lot. A body later identified as Paula was found inside the vehicle wrapped in blankets, which were fastened with duct tape. An autopsy determined that the cause of death was two gunshot wounds to the head.

When confronted by the police with news of his wife's death, Lanz volunteered that he did not kill Paula, but instead that his friend, Karl Laughlin, did. Forensic testing at Lanz's residence revealed the presence of blood splatters at the bottom of the basement stairs. DNA analysis confirmed the blood belonged to Paula. There was also an area at the bottom of the stairs where a rug had obviously been recently removed.

According to Lanz, he had been complaining to Laughlin about Paula and the problems they were having. Laughlin allegedly told Lanz not to worry, and that he would "take care of his problem." Lanz claims that while he was outside playing with his children Paula arrived at the house. A short time later Laughlin came outside and told Lanz, "I took care of your problem." Lanz then claims that he took his kids out to eat, and when he returned to the house questioned Laughlin about what he had done. Lanz claims that Laughlin then told him, "I shot her. I'll take care of everything. I'll take care of the cleanup. You work about your alibi." According to Lanz, Laughlin left early the next morning in Paula's van to get rid of the body. Lanz claims that he gave Laughlin $300 and the PIN to Paula's ATM card. Lanz kept in touch with Laughlin over the next several days and sent him money.

Neighbors, who were aware of the problems between Lanz and Paula, said that they frequently watched events at Lanz's residence. According to the neighbors, and contrary to Lanz's story, on the evening of January 28th Lanz was not outside with his daughters during the time he said that he was and that he

claimed Laughlin had murdered Paula. The neighbors also told the police that they saw Paula's minivan at the home that evening backed up against the garage door. The neighbors said that they were alerted to the vehicle's presence because they heard tires squealing as Lanz attempted to pull the vehicle out of the icy driveway.

In addition, several witnesses testified that in the months leading up to Paula's death, Lanz made comments about killing his wife. According to a former co-worker of Lanz's, Lanz had once asked him if he knew anyone who could "take care of" his wife, had indicated that he would be pay someone to do it, and asked if he could get him a small handgun. Another co-worker testified that he once heard Lanz say that he was going to "kill the bitch," referring to Paula, and had later told the co-worker that he was looking to buy a gun.

Laughlin was arrested on an outstanding warrant for assaulting his girlfriend, and was also charged with arson related offenses for setting Paula's van on fire. Laughlin advised the police that he wanted to talk to them about Paula's death. In exchange for an agreement that he would not be charged with criminal homicide, Laughlin told the police his version of the story. According to Laughlin, he had seen Lanz shoot and kill his wife. At trial, Laughlin testified that he was hiding out at Lanz's house because of the outstanding warrant. Laughlin testified that he was with Lanz all day on January 28th, and that he had overheard several phone conversations Lanz had that day. During one of the calls, Lanz said, "[t]hat bitch is making me move out of this house on the 31st."

Laughlin went on to add that after Paula arrived at Lanz's house, he overheard Paula demand the "land contract" for the second house from Lanz. Lanz allegedly replied that the contract was in the basement, and he and Paula went downstairs to retrieve it. Laughlin then claims he heard Lanz and Paula arguing. According to Laughlin, Lanz called Paula a "fucking bitch." Laughlin stated that he then heard Paula call Lanz an "asshole," followed by a scream and a "popping sound." Laughlin claims that he was alerted by the sound and went downstairs. When he was near the bottom of the stairs, he saw Lanz backing through a door between rooms in the basement, followed by Paula. Paula was holding her jaw and had blood dripping through her hands. Paula then stumbled and fell back into a corner. According to Laughlin,

he then saw Lanz walk up to Paula, stand over her, point a gun at her, and fire two rounds into the top of her head, killing her instantly. Lanz then allegedly pointed the gun at Laughlin and said, "I'll kill you. You're going to help me get away with this. I'll kill everybody involved. I'm done. I've reached the end."

According to Laughlin, Lanz then left the room briefly and returned with blankets and duct tape, which he used to wrap Paula's body. Laughlin and Lanz then moved the body into Paula's minivan, and covered it with tires and other debris. Laughlin said he then overheard Lanz make several phone calls, including one to his daughters' babysitter, telling her that Paula was going out of town and that he needed her to come to Paula's house in the morning to watch the girls. Lanz then had Laughlin take one of the girls and drive the van containing Paula's body to Paula's house, while Lanz took his other daughter and drove to Paula's house in his truck. The next morning when the babysitter arrived, Lanz gave Laughlin $300, Paula's ATM card and PIN number, and Paula's cell phone, and asked him to get rid of the body. Lanz told Laughlin that he would call him at several prearranged times.

Laughlin drove south with the body, but stopped at a truck stop to call Lanz and ask for more money. After Lanz wired him the money, Laughlin continued driving, and ended up in Nashville, Tennessee. Laughlin then set Paula's van, still containing her body, on fire, and hitchhiked home to Pennsylvania. Despite reaching an agreement with the police that he would not be charged with criminal homicide, no agreement was made regarding the other charges Laughlin faced for his involvement in the incident. Laughlin was ultimately charged with one count each of arson endangering persons, reckless burning, receiving stolen property, hindering apprehension of prosecution, fraud, abuse of a corpse, tampering with physical evidence, and three counts of criminal conspiracy.

Lanz was charged with one count each of the following: criminal solicitation, criminal homicide; criminal conspiracy, criminal homicide; hindering apprehension/concealing evidence; false reports to law enforcement; and criminal homicide. On September 2, 2008, a jury found Lanz guilty of first-degree murder, criminal conspiracy in connection with the charges of abuse of a corpse and tampering with evidence, false reports to

law enforcement, abuse of a corpse, and tampering with evidence.

On December 2, 2008, the trial court sentenced Lanz to life without parole for first degree murder, and to concurrent terms of one to two years' incarceration each for false reports to law enforcement, abuse of a corpse, and tampering with evidence.

*Commonwealth v. Lanz*, No. 871 WDA 2009, at 1-8 (Pa. Super. filed 8/24/11) (unpublished memorandum). This Court affirmed the judgment of sentence, and the Supreme Court of Pennsylvania denied review of the appeal on April 10, 2012.

Shortly thereafter, Lanz filed a timely PCRA petition *pro se*. The PCRA court appointed counsel to represent Lanz. After multiple extensions of time for filing, and a breakdown in the operation of the PCRA court, Lanz filed the instant second amended PCRA petition raising two claims of trial counsel ineffectiveness. The PCRA court subsequently filed a notice of its intent to dismiss the petition without a hearing, and on July 21, 2015, the PCRA court entered a final order dismissing Lanz's PCRA petition. This timely appeal followed.

On appeal, Lanz presents two separate assertions of trial counsel ineffectiveness that he believes entitle him to a hearing before the PCRA court. This Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *See Commonwealth v. Halley*, 870 A.2d 795, 799 n.2 (Pa. 2005). The PCRA

court's findings will not be disturbed unless there is no support for the findings in the certified record. *See Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. 2001). Moreover, a PCRA court may decline to hold a hearing on the petition if the PCRA court determines that the petitioner's claim is patently frivolous and is without a trace of support either in the record or from other evidence. *See Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa. Super. 2001).

Because Appellant's claims challenge the stewardship of prior counsel, we apply the following principles. Counsel is presumed to be effective, and Appellant has the burden of proving otherwise. *See Commonwealth v. Pond*, 846 A.2d 699, 708 (Pa. Super. 2004).

> In order for Appellant to prevail on a claim of ineffective assistance of counsel, he must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Appellant must demonstrate: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. The petitioner bears the burden of proving all three prongs of the test.

*Commonwealth v. Johnson*, 868 A.2d 1278, 1281 (Pa. Super. 2005) (citations omitted). In assessing a claim of ineffectiveness, when it is clear that appellant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. *See Commonwealth v. Travaglia*, 661 A.2d

- 7 -

352, 357 (Pa. 1995). Counsel cannot be deemed ineffective for failing to pursue a meritless claim. **See Commonwealth v. Loner**, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

Lanz first argues that trial counsel was ineffective for failing to argue that Karl Laughlin's testimony regarding the number of shots fired by Lanz was inherently contradictory. Lanz alleges that Laughlin first testified that Lanz fired two shots into the victim's head, before later testifying that there were three shots. Lanz therefore contends that had trial counsel aggressively attacked this alleged inconsistency during closing arguments, the result of the trial would likely have been different.

The primary problem with Lanz's argument is that it misconstrues the record. He is correct that Laughlin first testified on direct examination that he watched Lanz shoot the victim twice in the head. **See** N.T., Trial, 8/27/08, at 321. Furthermore, he is correct in stating that Laughlin subsequently testified to a total of three shots. **See id**., at 382. However, the critical distinction elided by Lanz is that Laughlin testified that he heard the first shot before he proceeded downstairs to observe the altercation between Lanz and the victim. **See id**., at 378. Therefore, there is no actual contradiction between Laughlin's statements that he saw Lanz shoot the victim twice and that there were a total of three shots. We thus conclude that Lanz's first claim of trial counsel ineffectiveness lacks arguable merit, and affirm the PCRA court's decision to dismiss it without a hearing.

Next, Lanz argues that trial counsel was ineffective by failing to present the testimony of his daughter and of an unnamed case worker from the Allegheny County Office of Children, Youth and Families ("CYF"). It is undisputed on appeal that notes generated by an unknown caseworker at CYF indicate that Lanz's daughter had claimed to witness Laughlin murder the victim. Lanz contends that trial counsel was ineffective for failing to call either his daughter or the caseworker at trial.

With respect to Lanz's argument that counsel should have called his daughter to testify, Lanz did not plead or certify that his daughter would have testified consistently with the statement contained in CYF's notes. This failure is fatal to Lanz's contention that he is entitled to a hearing on this claim. **See Commonwealth v. Reid**, 99 A.3d 427, 438 (Pa. 2014); 42 Pa.C.S.A. § 9545(d)(1).

Regarding Lanz's argument that trial counsel should have called the unnamed CYF caseworker to testify, Lanz's failure is even more basic: He has failed to even identify who this person is, let alone that he or she would have testified in conformity with the notes held by CYF. Thus, the PCRA court was correct in finding that Lanz had not established his right to a hearing on this argument.

Finally, Lanz makes a passing argument that trial counsel should have presented the CYF notes at trial pursuant to hearsay exceptions. The PCRA court addressed the substance of this claim as follows.

Finally, given the facts of the case and the evidence presented, even if this statement could have somehow made it into evidence, it could not possibly have changed the outcome of the trial. It was not disputed that Karl was present in the home when the victim was shot. Nor was it disputed that the defendant's daughters were in the home though it is not clear that they were aware of what happened. Laughlin testified that he heard the shot when he was upstairs. It must be remembered that the girls were in their fathers' custody after the murder of their mother until his arrest several days later. What, if anything, he told the girls is unknown. Where they were when their mother was shot is also unknown. It would not be unreasonable for a five-year-old child to assume, after learning that her mother had been shot, that the person who shot her was the only other person in her home than her father, Karl Laughlin. In the absence of any corroboration of the statement, there is no way that this comment by a 5 ½-year-old-child could have possibly changed the outcome of the trial.

PCRA court opinion, 1/2/15, at 8. Thus, it is clear the PCRA court found that even assuming the admissibility of the CYF notes, Lanz did not establish the prejudice prong of his claim. We cannot conclude that this reasoning constitutes an abuse of the PCRA court's discretion, and therefore Lanz's second argument on appeal merits no relief.

As we conclude that neither of Lanz's arguments on appeal merit relief, we affirm the PCRA court's order dismissing Lanz's PCRA petition.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/14/2016