**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RASHAN MICKENS | : | |
| | : | |
| Appellant | : | No. 2719 EDA 2017 |

Appeal from the PCRA Order August 1, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000351-2013

BEFORE: OTT, J., DUBOW, J., and COLINS*, J.

MEMORANDUM BY OTT, J.: **FILED AUGUST 12, 2019**

Rashan Mickens appeals, *pro se*, from the order entered August 1, 2017, in the Court of Common Pleas of Philadelphia County, that dismissed, without a hearing, his first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. Mickens seeks relief from the judgment of sentence of life without the possibility of parole, imposed upon his conviction of murder in the first degree, violation of the Uniform Firearms Act, and possession of an instrument of crime.[1] On appeal, Mickens claims that trial counsel was ineffective for: (1) failing to move to suppress evidence seized pursuant to two search warrants; (2) entering into stipulations at the

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 6110.2, and 907, respectively.

preliminary hearing that equated to a guilty plea; (3) failing to challenge impermissibly suggestive single-photo identifications of him by several witnesses; (4) failing to challenge the ballistics report at the preliminary hearing; and (5) failing to object to the testimony of the victim's mother. *See* Mickens' Brief at 5. Based upon the following, we affirm.

This court previously described the facts and procedural history of this matter as follows:

> . . . On May 1, 2012 at approximately 6:20 a.m., police found Darrick Trawick (Decedent) dead. Decedent's body was on the porch of a rooming house located at 1317 West Erie Avenue in Philadelphia, where Decedent resided. An autopsy determined that the cause of death was a single gunshot contact wound to Decedent's chest from a 0.25 caliber bullet. [Mickens], who resided in the adjoining rooming house at 1319 West Erie Avenue,[a] was subsequently arrested in connection with the shooting of Decedent, but claimed the shooting was in self-defense as Decedent was attacking him in Mickens' room.
>
> > [a] 1317 West Erie and 1319 West Erie are adjoining residences with a common front porch that a railing divides.
>
> [Mickens] frequently targeted Decedent with homophobic slurs and, occasionally, physical violence. According to two other residents of the rooming house, Sheila Booker and Wayne Ebron, Decedent was not violent and did not attempt to fight back when [Mickens] harassed him.
>
> Specifically, Booker testified to the persistent conflict between Decedent and [Mickens]. She stated that Decedent was not the "violent type." She recalled that on the evening of the shooting, Decedent came to her room upset because [Mickens] had ripped his jacket and took his cell phone during a physical altercation earlier that day. Decedent told Booker that [Mickens] was "doing it again . . . something is going to happen tonight." Decedent also showed Booker that he was carrying two "weights" for protection. Booker said she knew Decedent was "scared because he actually

had tears in his eyes." Booker encouraged Decedent "to confront [Mickens] because you can't keep running. . . . He keeps coming over here doing stuff to you."

Similarly, Ebron recalled that on the afternoon before the murder, he purchased beer from [Mickens] out of [Mickens'] room,[b] which was located in the building at 1319 West Erie Avenue. While he was in [Mickens'] room, Ebron saw a 0.25 caliber semi-automatic handgun and part of a TEC–9 submachine gun in [Mickens'] room. A short time later, Ebron heard [Mickens] state he was "getting tired of that f[* *]got" and that he intended to "f[* *]k that n[* *]ga up," referring to Decedent. Later that evening, while speaking to Ebron on the phone, [Mickens] said "the f[* *]got[, Decedent,] started that s[* *]t again." Ebron also said that [Mickens] told him he "was out there fighting [Decedent,] but the boy would not swing back." Ebron testified that [Mickens] always referred to Decedent as "a little f[* *]got, a little f[* *]got boy."

> [b] [Mickens] admitted that he sold cigarettes, beer, marijuana, and crack/cocaine out of his room to the other tenants of the rooming houses.

A third resident of the rooming house, John Ward, testified that he observed two verbal altercations between [Mickens] and Decedent on the day leading up to the murder. The first occurred in the afternoon. The second argument occurred in the evening, during which Decedent asked [Mickens] where his phone was and why [Mickens] had ripped his jacket. Later that night, when Ward went to [Mickens'] room to purchase two cigarettes, he saw Decedent lying motionless on the hallway floor outside [Mickens'] room. [Mickens] told Ward that he and Decedent "went at it," and Ward observed a cut on [Mickens'] forehead. Ward and [Mickens] moved Decedent outside to the porch of 1319 West Erie Avenue, and [Mickens] lifted Decedent's body over the railing to the porch of 1317 West Erie.

At trial, [Mickens] admitted to being in a fistfight with Decedent between 5:00 p.m. and 6:00 p.m. on April 30, 2012, which lasted 30 minutes. Later, [Mickens] claimed that Decedent came to [Mickens'] apartment around 1:00 to 1:30 a.m. on the morning of May 1, 2012. At that point, Decedent allegedly brandished a hammer and hit [Mickens] in the forehead with it. [Mickens] then claimed that Decedent pushed his way into [Mickens'] room and continued to swing the hammer. In response, [Mickens] picked

up a .25 caliber handgun, pointed it at Decedent, and told him to leave. At that point, [Mickens] maintains he does not know what happened because "[e]verything happened so fast. . . . The gun goes off. I heard it go off. I am looking. [Decedent] didn't fall or anything. He just looked at me and said, oh, s[* *]t[.] He turned around and he runs out [.]" [Mickens] claimed that Decedent dropped the hammer in his room.

[Mickens] then walked to the Temple University Hospital, where he received stitches and staples for his wounds. Specifically, his medical records showed that he was a walk-in patient at 3:23 a.m. on May 1, 2012, with complaints that he was hit with a hammer in the forehead and left posterior scalp while being robbed. He was discharged at 6:47 a.m. on the same day after his wounds were closed with staples. Following his discharge, he went to stay with a friend and did not return to the rooming house "[b]ecause [he] already had seen what happened and [he] was afraid and [he] didn't want to go back."

Booker discovered Decedent's body on the porch of 1317 West Erie Avenue at approximately 6:00 a.m. on May 1, 2012 and immediately called the police. Paramedics pronounced Decedent dead at 6:20 a.m. The medical examiner determined the cause of death was a gunshot wound to the chest. He further testified, "the end of the weapon was in direct contact with [Decedent's] body when it was discharged." The medical examiner recovered a bullet from Decedent's chest.

On May 1, 2012, [p]olice executed a search warrant on [Mickens'] room and collected swabs of the doorjamb of the front door, a cutout from bloodstained blue curtains on the front window, a bloodstained bath towel, a bloodstained hand towel, and a green tote bag. The green tote bag contained vials of marijuana, a 0.25 caliber handgun manufactured by Raven Arms, a TEC–9 handgun, 29 additional 9–millimeter cartridges, and a box of 37 additional 0.25 caliber cartridges. The Raven Arms 0.25 caliber gun had a fired cartridge casing that was not properly expelled from the gun along with a second, misfed cartridge in the gun barrel (*i.e.*, a "stovepipe"), and four cartridges in the magazine. The TEC–9 was loaded with one chambered cartridge and 26 cartridges inside the magazine. Both guns had obliterated serial numbers. DNA swabs of both guns tested positive for [Mickens'] DNA. Moreover, Decedent was excluded as a contributor to the DNA samples from the guns and [Mickens'] front doorjamb. A ballistics expert later

matched the bullet recovered from Decedent's chest to the 0.25 caliber Raven Arms handgun discovered in [Mickens'] room with [Mickens'] DNA on it.

On May 1, 2012, Ebron informed [Mickens] in a phone call that the police were searching his room. [Mickens] hung up on Ebron, and turned his phone off to avoid Ebron's repeated calls. [Mickens] admitted that he did not return to the rooming house "[b]ecause [he] was afraid, basically. [He] kn[e]w [Decedent] [was] dead[.] [He was] really scared. [Killing Decedent] wasn't [Mickens'] intention at all." [Mickens] went to his girlfriend's residence, never returning to the rooming house.

On May 9, 2012, an arrest warrant was issued for [Mickens]. On July 26, 2012, he was arrested near 5500 Washington Avenue in Philadelphia, which was around his girlfriend's residence. On January 11, 2013, the Commonwealth filed an information, charging [Mickens] with the above-mentioned offenses, as well as one count each of possession of a firearm prohibited, abuse of a corpse, possession with the intent to deliver, and one additional count of possession of a firearm with an altered manufacturer's number. On July 15, 2014, a four-day jury trial commenced. On July 18, 2014, the jury found [Mickens] guilty of one count each of first-degree murder, possession of a firearm with an altered manufacturer's number, and PIC. The Commonwealth *nolle prossed* the remaining charges. That same day, the trial court sentenced [Mickens] to a mandatory sentence of life without the possibility of parole for the first-degree murder conviction, and two and one-half to five years' incarceration on each of the two other convictions, concurrent to the life without parole sentence. On July 28, 2014, [Mickens] filed post-sentence motions, which the trial court denied without a hearing on August 4, 2014. On September 3, 2014, [Mickens] filed a timely notice of appeal.

*Commonwealth v. Mickens*, 2015 WL 6689556, at **1-3 (Pa. Super. Aug. 14, 2015) (unpublished memorandum) (record citations and some footnotes omitted).

On August 14, 2015, this Court affirmed the judgment of sentence. *Id.* at \*1. Mickens did not seek leave to appeal to the Pennsylvania Supreme Court.

On September 9, 2016, Mickens timely filed a *pro se* PCRA petition. The PCRA court subsequently appointed counsel. On February 22, 2017, counsel moved to withdraw.[2] On June 15, 2017, the PCRA court issued a Pa.R.Crim.P. 907 notice of intent to dismiss the PCRA petition. Mickens filed a *pro se* response on July 6, 2017. The PCRA court ultimately dismissed the petition and permitted counsel to withdraw on August 1, 2017. The instant, timely appeal followed.[3]

On appeal, Mickens claimed that he received ineffective assistance of trial counsel. The principles that guide our review are well settled.

> We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and are free of legal error. When supported by the record, the PCRA court's credibility determinations are binding on this Court, but we apply a *de novo* standard of review to the PCRA court's legal conclusions. We must review the PCRA court's findings and the evidence of record in a light most favorable to the Commonwealth as the winner at the trial level.

\* \* \* \*

---

[2] *See* ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988); ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[3] In response to the PCRA court's order, Mickens filed a timely concise statement of errors complained of on appeal on September 21, 2017. On October 26, 2017, the trial court issued an opinion.

With respect to claims of ineffective assistance of counsel, counsel is presumed to be effective, and the petitioner bears the burden of proving to the contrary. To prevail, the petitioner must plead and prove, by a preponderance of the evidence, the following three elements: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice as a result of counsel's action or inaction. With regard to the second prong (reasonable basis), we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. We will hold that counsel's strategy lacked a reasonable basis only if the petitioner proves that a foregone alternative offered a potential for success substantially greater than the course actually pursued. Our review of counsel's performance must be highly deferential. To establish the third element (prejudice), the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction.

Because a petitioner's failure to satisfy any of the above-mentioned elements is dispositive of the entire claim, [a] court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the ineffectiveness test, the court may proceed to that element first.

* * * *

With respect to [a petitioner's] claim that he should have been provided a full evidentiary hearing on all of his PCRA claims, the law in this area is clear:

[T]he PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings. To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing. **We stress that an evidentiary hearing is not meant to function as a fishing expedition for any possible evidence**

- 7 -

**that may support some speculative claim of ineffectiveness.**

*Commonwealth v. Brown*, 196 A.3d 130, 150-151, 192-193 (Pa. 2018) (citations, internal citations, and quotation marks omitted, emphasis added).

In his first issue, Mickens contends that trial counsel was ineffective for failing to move to suppress, pursuant to the United States Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978), the evidence obtained through two search warrants because of allegedly false information contained in the supporting affidavits. Mickens' Brief, at 11-13. We disagree.

In neither in his PCRA petition nor his brief on appeal, does Mickens ever specify the information in the supporting affidavits he claims was false. *See* Post Conviction Relief Act Petition, 9/09/2016, at 8-10; Mickens' Brief, at 11-13. Further, Mickens has never explained other than in the most general terms, *see id.*, the basis for his belief that such a motion to suppress would have succeeded. We have stated, "[c]ounsel cannot be deemed ineffective for failing to pursue a meritless claim." *Commonwealth v. Loner*, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*) (citation omitted), *appeal denied*, 852 A.2d 311 (Pa. 2004). Thus, as Mickens has failed to show that his underlying claim has merit, he is not entitled to relief.

In the second and fourth issues, Mickens claims counsel was ineffective during his preliminary hearing for "approving stipulations by the prosecution that essentially equated to [c]ounsel entering a guilty plea[,]" Mickens' Brief, at 14-17; and for failing to challenge the ballistics report. *See id.* at 22-24.

However, our Supreme Court has held that once a defendant has plead guilty or gone to trial and been found guilty he cannot establish actual prejudice relative to alleged errors that took place at a preliminary hearing. **See Commonwealth v. Sanchez**, 82 A.3d 943, 984 (Pa. 2013), *cert. denied*, 135 S.Ct. 154 (2014). Therefore, his second and fourth claims of ineffective assistance of counsel must fail.

In his third issue, Mickens contends that trial counsel was ineffective for failing to challenge the identification testimony of some of the Commonwealth's witnesses, because they "were given individual photos instead of a photo array consisting of multiple individuals[.]" Mickens' Brief, at 18; **see id.** at 18-21. We disagree.

In its decision, the PCRA court aptly disposed of this issue as follows:

[Mickens'] identity was not at issue. All the people in this case knew each other. They came from adjoining houses where they all rented rooms and had known each other for a very long time and had interacted on a daily basis and they all knew the name of [Mickens]. So this was not an issue of identification. Therefore, that issue lacks merit. Once again, [c]ounsel cannot be found ineffective for failing to file a frivolous motion.

N.T. PCRA Decision, 6/15/2017, at 8. Moreover, as discussed above, Mickens' defense was not mistaken identity but self-defense. We agree with the PCRA court that, given the fact that Mickens admitted to the shooting, and given the personal relationships he had with these witnesses, any motion seeking to suppress the identifications would have been frivolous. **See Loner**, **supra**. Mickens' third claim does not merit relief.

- 9 -

In his fifth and final issue, Mickens claims that counsel was ineffective for failing to object to the testimony of the decedent's mother. Mickens' Brief, at 25-27. However, Mickens waived this claim.

Mickens did not raise this claim in his PCRA petition or in his Rule 1925(b) statement. *See* Post Conviction Relief Act Petition, *supra* at 6; Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. Rule 1925(b), 9/21/2017, at unnumbered page 2. We have long held that an appellant waives PCRA issues on appeal that he did not raise in the PCRA petition. *See Commonwealth v. Lauro*, 819 A.2d 100, 103-04 (Pa. Super. 2003), *appeal denied*, 830 A.2d 975 (Pa. 2003) (waiving five issues not in original or amended PCRA petition). Also, as amended in 2007, Pennsylvania Rule of Appellate Procedure 1925 provides that issues that are not included in the Rule 1925(b) statement or raised in accordance with Rule 1925(b)(4) are waived. *See* Pa.R.A.P. 1925(b)(4)(vii); *see also Commonwealth v. Lord*, 719 A.2d 306, 308 (Pa. 1998), *superseded by rule on other grounds as stated in Commonwealth v. Burton*, 973 A.2d 428, 430 (Pa. Super. 2009). Further, an appellant cannot raise a subject for the first time on appeal. *See Commonwealth v. Hanford*, 937 A.2d 1094, 1098 n.3 (Pa. Super. 2007), *appeal denied*, 956 A.2d 432 (Pa. 2008) (new legal theories cannot be raised for first time on appeal); Pa.R.A.P. 302(a). Here, Mickens did not argue this issue in his PCRA petition, never moved to amend his PCRA petition, did not raise it in his Rule 1925(b) statement, and raised the issue for the first time

in his brief on appeal. Thus, he waived his contention.[4] ***See Lord***, ***supra*** at 308; ***Handford***, ***supra*** at 1098 n.3; ***Lauro***, ***supra*** at 103-04.

As Mickens' claims are either waived or meritless, we affirm the denial of his PCRA petition without an evidentiary hearing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/12/19

---

[4] Mickens argues in his reply brief that he did not waive this issue because his Rule 1925(b) statement contained a request to supplement it when he received the notes of testimony. Mickens' Reply Brief, at 6. Mickens correctly notes, ***see*** Mickens' Reply Brief, at 6-7, that we remanded this matter to the PCRA court so that he could obtain the trial transcripts. However, Mickens did not petition the PCRA court while on remand for leave to file an amended PCRA petition to include this claim. **See** Pa.R.Crim.P. 905(A); ***Commonwealth v. Mason***, 130 A.3d 601, 626 n.30 ( Pa. 2015) (stating PCRA petitioner may not raise new claims by merely supplementing pending PCRA petition without court authorization because doing so wrongly subverts the PCRA's time limitation and serial petition restrictions). Thus, we disagree with his contention that he preserved this claim.