J-S40009-20
J-S40010-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| OMAR JOHNSON | : | |
| Appellant | : | No. 1614 EDA 2019 |

Appeal from the PCRA Order Entered April 29, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0013628-2007

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| OMAR JOHNSON | : | |
| Appellant | : | No. 1617 EDA 2019 |

Appeal from the PCRA Order Entered April 29, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0013632-2007

BEFORE:   SHOGAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:          **FILED DECEMBER 21, 2020**

Appellant, Omar Johnson, filed two separate notices of appeal from the denial of his request for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  Appellant asserted that ineffective assistance of counsel entitles him to a new trial for the crimes prosecuted at Philadelphia

---

[*] Retired Senior Judge assigned to the Superior Court.

Court of Common Pleas Docket Number CP-51-CR-0013628-2007, corresponding to Superior Court Docket Number 1614 EDA 2019, and Philadelphia Court of Common Pleas Docket Number CP-51-CR-00013632-2007, corresponding to Superior Court Docket Number 1617 EDA 2019. Appellant raised the identical issue and filed the same brief in both appeals. As such, pursuant to Pa.R.A.P. 513, we have consolidated these appeals *sua sponte*, and address them concurrently. After careful review, we affirm.

The PCRA court recounted the relevant facts, as follows:

On November 13, 2003, [J.W.], who was then thirteen years-old, left her after-school program at Benjamin Rush Middle School at about 4:30 p.m. [J.W.] took a school bus that dropped her off at Elkin Elementary School at around 5:00 p.m. where she was then going to take a 10-15 minute Septa bus ride to her house. However, when [J.W.] arrived at Elkin Elementary School, she discovered that she lost her Septa token so she decided to walk home down Kensington Avenue and Alleghany Avenue. As evening approached, the streets became dark. Additionally, the power had gone out on the Avenue and nearby stores were closed. After walking about five or six blocks, Appellant approached [J.W.] and attempted to get her attention by making a noise and saying that his name was Tony. When [J.W.] ignored him, Appellant grabbed her hip and put a gun to her side instructing that if she screamed he would shoot her in her stomach. Appellant then pulled [J.W.] into an abandoned garage on the 2400 block of Lee Street. Once inside the garage, he laid [J.W.] on a table and pulled down her pants. He vaginally penetrated her while she was on her back then flipped her over and did it again while she was on her stomach. When he was finished, he pulled his pants back up and left.

Several minutes after Appellant left the garage, [J.W.] walked home and told her parents about what had just happened. [J.W.'s] parents immediately called the police. Officer Michael Cahill and his partner, Officer McKeever, responded to the call and went to [J.W.'s] home. After describing the events to the police, [J.W.] and her mother went with Officer Cahill to the garage where

- 2 -

the incident occurred.  Afterwards, Officer Cahill drove [J.W.] and her mother to Episcopal Hospital.  While at the hospital, [J.W.] spoke to a detective from the Special Victim's Unit and underwent an exam where a rape kit was performed.

On March 31, 2004, [C.B.] who was then sixteen years old, was waiting at a bus stop at 2nd Street and Girard Avenue at around 8:00 p.m. when she was approached by Appellant. Appellant drove his car up to [C.B.] and asked her if she would like to get something to eat with him then told her to get into the car.  When she declined to get into Appellant's car, he got out of the car, leaving the engine running and walked in front of the car towards [C.B.].  When the Appellant reached [C.B.], he held a gun to her back demanding again that she get in the car.  At that time, [C.B.] got into the passenger's seat of the car.  While Appellant walked around the front of the car to get back inside, she tried to get out of the car; however there was no door handle.  When Appellant got back in the car, he drove off in the direction of [C.B.'s] father's house.

After driving for approximately fifteen blocks, Appellant stopped at an empty parking lot five blocks from [C.B.'s] father's house.  Once parked, the Appellant demanded oral sex from [C.B.] and reminded her that he had a gun.  [C.B.] reluctantly complied. Afterwards, Appellant leaned over [C.B.] to put her seat back.  He made her pull her pants down and forcefully penetrated her vagina.  [C.B.] cried and screamed as Appellant was having sex with her.  Appellant told her to be quiet.  When he was done he got out of the car, opened [C.B.'s] door and told her to get out of the car.  When he drove off, [C.B.] ran toward her father's house. As she did, she saw a police car that she tried to flag.  However, the officer drove off without seeing her.

When [C.B.] reached her father's house, she told her father and stepmother what had just occurred.  The police were called and Officer Sonya Ellis responded to [C.B.'s] father's home.  Id. at 74, 117.  Officer Ellis took [C.B.] to Thomas Jefferson hospital, where an exam and rape kit were conducted.  While at the hospital, [C.B.] also talked to Detective Gregory Meissler from the Special Victim's unit.  After an unsuccessful attempt to apprehend the offender, both [J.W.'s] and [C.B.'s] cases were transferred to Detectives Peter Marcellino and Linda Pace of the special investigative unit.

At trial, Appellant alleged that both encounters with the victims was consensual and that he did not force himself on either of the girls. Furthermore, he testified that both girls wanted to be paid in exchange for sex. Appellant claimed that [J.W.] was a prostitute who demanded $50. He also claimed that he gave [C.B.] his phone number so that he could pay her at a later time.

During closing arguments, the prosecutor repudiated the Appellant's testimony by reiterating that what happened to the victims was not consensual. The prosecutor focused on the fact that the victims were young girls, not prostitutes, and that they were forced to comply with Appellant's commands because of his gun. She stated that Appellant's actions were "cold" and "sick" because "while the Appellant may had convinced himself that the girls wanted it," they did not.

PCRA Court Opinion, 12/3/19, at 2–5 (record references omitted).

On or about July 5, 2007, police arrested Appellant and charged him with the crimes associated with the rapes of [J.W.] on November 13, 2003, and [C.B.] on March 31, 2004. On February 25, 2010, a jury found Appellant guilty of two counts of rape, one count of involuntary deviate sexual intercourse, two counts of kidnapping, two counts of sexual assault, two counts of corruption of minors, two counts of violation of the Uniform Firearm Act, and two counts of possessing instruments of crime.[1] On October 21, 2010, the court conducted a Megan's Law hearing and found Appellant to be a sexually violent predator. That same day, the court sentenced Appellant to an aggregate term of thirty-two to eighty years of incarceration.

_____

[1]  18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1), 2901(a), 3124.1, 6301(a)(1), 6105(a)(1), and 907(a), respectively.

- 4 -

Appellant filed a direct appeal and, on November 29, 2011, this Court affirmed the judgment of sentence. ***Commonwealth v. Johnson***, 38 A.3d 932, 2912 EDA 2010 (Pa. Super. filed November 29, 2011) (unpublished memorandum). On April 25, 2012, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. ***Commonwealth v. Johnson***, 44 A.3d 1161, 658 EAL 2011 (Pa. filed April 25, 2012).

On August 28, 2012, Appellant filed *pro se* PCRA petitions. On January 28, 2014, appointed counsel, Mark Mungello, Esquire, filed amended PCRA petitions. Mr. Mungello was later relieved and Matthew J. Wolfe, Esquire, was appointed to represent Appellant. Mr. Wolfe filed several amended petitions. Following an evidentiary hearing on January 4, 2019, on April 26, 2019, the PCRA court dismissed the PCRA petitions. On May 30, 2019, Appellant filed notices of appeal. Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

We initially address whether the appeals were timely. A review of the certified record reveals that the orders dismissing the PCRA petitions state: "And Now, this 29th day of April, 2019, it is hereby ORDERED that the Defendant's PCRA petition is DISMISSED, effective April 26, 2019. [Appellant] has the right to appeal this decision to the Superior Court within thirty days of this Order." Order, 4/29/19. This order is time-stamped as filed on April 29, 2019. Additionally, the official docket demonstrates that the orders dismissing the petition were filed on April 29, 2019. Docket Entry

## 259, 253.  Therefore, Appellant's appeals, filed on May 30, 2019, and thirty-one days after the orders dismissing his PCRA petition were filed, are facially untimely.

On August 21, 2019, this Court directed Appellant "to show cause, within ten days of the date that this Order is filed, why this appeal should not be quashed as untimely filed on May 30, 2019, from the order denying the petition for post-conviction relief on April 26, 2019."  Rule to Show Cause, 8/21/19, at unnumbered 1.  Appellant responded that counsel received notice from the Philadelphia County Court of Common Pleas that the orders dismissing the PCRA petitions were filed on April 30, 2019, and attached a copy of the email.  The email read:

> A court order or court notice has been issued and filed with the Office of Judicial Records pursuant to Pa. R.Crim.P. 114 (A)(1) in connection with a case in which you are either the attorney of record for a party, or are an unrepresented party. Service of such legal paper is hereby accomplished electronically on you as authorized by Philadelphia Criminal Rule 576 (g).
>
> The following information is provided for your records:
> Docket No.: CP-51-CR-0013632-2007
> Caption:
> Com. v. Johnson, Omar
> Date of Entry on Docket:
> April 30, 2019 12:02 EDT/DST

Response to Rule to Show Cause, 8/28/19, Exhibit A.  Counsel thus averred that the appeals, filed on May 30, 2019, were timely.  Counsel alternatively requested the Superior Court to excuse the appeals' untimeliness as it was occasioned by a "breakdown in the judicial process by a standard practice of

the Philadelphia Court of Common Pleas. . . ." ***Id.*** at ¶ 8. On August 29, 2019, this Court discharged the Rule to Show Cause and referred the matter to the merits panel.

We agree with counsel that the appeals' untimeliness resulted from a breakdown by the Philadelphia County Court of Common Plea's judicial process. This Court will decline to quash an appeal when the appellant's error resulted from the trial court's misstatement of the appeal period, which operated as a "breakdown in the court's operation." ***Commonwealth v. Parlante***, 823 A.2d 927, 929 (Pa. Super. 2003) (footnote omitted) (citing ***Commonwealth v. Coolbaugh***, 770 A.2d 788, 791 (Pa. Super. 2001) (where appellant was led to believe that he had thirty days to appeal the denial of reconsideration motion, our Court declined to quash appeal because the problem arose as a result of the trial court's misstatement of the appeal period, which operated as a breakdown in the court's operation)). Herein, the notice from the Philadelphia County Court of Common Pleas stated that the orders dismissing the PCRA petitions were filed on April 30, 2019. Counsel was entitled to rely upon this representation when perfecting the appeals. Thus, we will address the merits.

Appellant raises the following issue for review: "Was trial counsel ineffective for failing to object to the prosecutor's remarks in closing argument as prosecutorial misconduct and raise the issue on appeal?" Appellant's Brief at 8.

When reviewing the propriety of an order denying PCRA relief, this Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. ***Commonwealth v. Rykard***, 55 A.3d 1177, 1183 (Pa. Super. 2012). We grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record. ***Commonwealth v. Rigg***, 84 A.3d 1080, 1084 (Pa. Super. 2014).

In order to obtain collateral relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). Instantly, Appellant asserted in his PCRA petition the existence of ineffective assistance of counsel ("IAC") pursuant to 42 Pa.C.S. § 9543(a)(2)(ii).

"To plead and prove an IAC claim, a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." ***Rykard***, 55 A.3d at 1189–1190. To show actual prejudice, a defendant claiming ineffective assistance of counsel is required to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. ***Commonwealth v. Mallory***, 941 A.2d 686, 699 (Pa. 2008) (quoting ***Strickland v. Washington***, 466 U.S. 668, 695 (1984)). A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any one

of these prongs. ***Commonwealth v. Martin***, 5 A.3d 177, 183 (Pa. 2010). We reiterate that counsel's representation is presumed to have been effective, unless the petitioner proves otherwise. ***Commonwealth v. Williams***, 732 A.2d 1167, 1177 (Pa. 1999). Further, we have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. ***Commonwealth v. Loner***, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

Appellant's issue presents an IAC claim based on alleged prosecutorial misconduct. Prosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue is to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. ***Commonwealth v. Riggle***, 119 A.3d 1058, 1068 (Pa. Super. 2015) (quoting ***Commonwealth v. Bryant***, 67 A.3d 716, 727–728 (Pa. 2013)). A "prosecutor must be free to present his or her arguments with logical force and vigor." ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1146 (Pa. 2011) (quoting ***Commonwealth v. Robinson***, 864 A.2d 460, 517 (Pa. 2004)). Pennsylvania courts have permitted prosecutorial advocacy "as long as there is a reasonable basis in the record for the [prosecutor's] comments." ***Robinson***, 864 A.2d at 516. "Prosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair." ***Chmiel***, 30 A.3d at 1145 (citation omitted). Furthermore, the prosecution must be permitted to respond to

defense counsel's arguments. *Id.* Any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. *Robinson*, 864 A.2d at 517.

Appellant argues that trial counsel should have requested a mistrial based upon the following portions of the prosecutor's summation:

> And then, callously and cold, [Appellant] gets out of the car, opens up the door-she can't even pull her pants up - and she's tossed out into the dirt lot. What happened to these girls was cold. And we know it happened.
>
> * * *
>
> Your common sense tells you that when somebody sticks a gun to your head, your back, your stomach, threatens to shoot you, your common sense tells you that in that situation, do you need to kick somebody? Do you need to punch them in order to get them to do what you want them to do? Do you have to put a knife – in addition to a gun, [to] have a 13-year-old submit to sexual assault?
>
> A gun is enough. The threat on your life is enough. The feeling that I will never get married, that I will never have kids, that my life will be over if I don't submit to sex is enough. The law contemplates that. And that's why the only people you need to hear from are [J.W] and [C.B.].
>
> * * *
>
> I couldn't help but clutch my stomach just a little bit as I watched him put his hand as if it were on [C.B.'s] head and stroke her hair and stroke her butt and talk about how good her head game was. He enjoyed that. It wasn't just about the sex. It was about the gun, and the violence, and about taking something. He enjoyed every moment.
>
> And the reason he remembers these two contacts, as opposed to any contact he's ever had in his life, is because it was a little different. He took these girls at gunpoint, and he enjoyed it.

He brought to life the fact that he knew - that he thought that [J.W.] was this young, little girl on the street when I showed that picture of her one month after. Couldn't help but get a little sick when you realized that he, too, thought that she looked like she was 5 or 6 years old, that girl that he wants you to believe was a woman, a prostitute on the street on Kensington Avenue.

Your common sense tells you that there aren't lockers on Kensington Avenue where a 13-year-old girl can put her backpack in and then go work the street. It's sick.

And maybe he's convinced himself that these girls wanted it, that these two girls on the street were looking for him; they were looking for sex. But you know that [J.W.] and [C.B.] never wanted this to happen. They didn't want to be taken off the street. They didn't want a gun to their bodies. They didn't want to have to think about this over and over again for the rest of their lives. They didn't want to have to come into this courtroom, in front of people they don't know, and testify about something brutal and terrible that happened to them six years later. They didn't want to live every single day, from the time that had happened until the time that they got his DNA, not knowing who it was that pulled them off the streets. (N.T. 2/25/10 p. 30-31).

Appellant's Brief at 9–10 (record references omitted).

The PCRA court disposed of this issue as follows:

Appellant's claims fail because none of the comments made by the prosecutor were of the type to have prejudiced the jury and prevent them from rendering a true verdict. Viewing the statements as a whole and not in isolation, it is clear that the prosecutor was simply painting a picture for the jury. The statements that the Appellant specifically alleges were prosecutorial misconduct state that the Appellant's actions were "callous and cold" and that "[w]hat happened to these girls was cold." These statements were not the prosecutor's attempt to inflame the jury, but were a mere attempt to tell a story to the jury and do so theatrically. The same could be said about the prosecutor's statements that, with regards to Appellant's testimony, she "couldn't help but get a little sick" and that she "couldn't help but clutch her stomach just a little bit." The words were simply oratorical [flair] to get the point across that what

Appellant did to the victims was forced upon them and, as such, horrific.

Moreover, contrary to Appellant's allegations, the prosecutor did not stray from the evidence in her closing argument and her statements were supported by the evidence. Each victim testified about the events that occurred on the nights in question. The prosecutor simply oratorically repeated for the jury what they had already heard.

Therefore, Appellant's claims fail because no prosecutorial [mis]conduct took place during closing arguments. Accordingly, even if Appellant's counsel had objected to the prosecutor's comments during closing arguments, and contested them on appeal, the outcome would not have been different. No relief should be granted.

PCRA Court Opinion, 12/3/19, at 7–8.

In this appeal, Appellant maintains that the prosecutor's statement that his actions were callous and cold was "calculated to inflame the passions or prejudices of the jury." Appellant's Brief at 16. Appellant's position is not sustainable. In *Commonwealth v. Clancy*, 192 A.3d 44 (Pa. 2018), the Pennsylvania Supreme Court held that a prosecutor's statements during closing argument calling a defendant "cold-blooded" or "cold heart[ed]" were permissible oratorical flair when they spoke "to the elements of the particular charges levelled against the defendant and the evidence necessary to prove those elements at trial. . . ." *Id.* at 64–65. Appellant's defense in this case was that the sexual acts of which he was accused, committed against a thirteen-year-old and a sixteen-year-old, were both consensual. N.T., 2/24/10, at 183, 198. The Commonwealth's evidence, however, proved that Appellant acted without the consent of either victim and threatened them with

- 12 -

a gun. N.T., 2/23/10, at 67, 87–88 (related to J.W.); N.T., 2/24/10, at 59, 69–70 (related to C.B.). Classifying Appellant's actions as "callous and cold" correlated to the Commonwealth's theory of the case, that he knowingly acted without the victims' consent and left them in precarious situations. Thus, the prosecutor's statement in this regard was permissible oratorical flair that summarized the trial evidence and rebutted Appellant's defense.

Appellant also asserts that trial counsel should have objected to the prosecutor's references to the victims' and Appellant's "unexpressed thoughts" before and during the rapes. Appellant's Brief at 16. Again, Appellant fails to demonstrate merit to this claim.

As noted, a prosecutor may argue any legitimate inferences from the evidence. *Commonwealth v. Ragland*, 991 A.2d 336, 340 (Pa. Super. 2010) (quotation omitted). During Appellant's trial, both victims testified that they were frightened during their non-consensual encounters with Appellant. N.T., 2/23/10, at 68 (related to J.W.); N.T., 2/24/10, at 61–62, 67 (related to C.B.). Therefore, the prosecutor's remarks in this regard arose in the context of the victims' expression of fear that Appellant would shoot them if they did not comply with his demands and represented a legitimate inference from their testimony.

Appellant's assertion that the prosecutor improperly referenced Appellant's unexpressed thoughts likewise is unavailing. The prosecutor's remarks that Appellant enjoyed the violence associated with raping the victims

at gunpoint recounted, albeit in dramatic fashion, Appellant's testimony that he liked his encounter with C.B. and did not rise to the level of prosecutorial misconduct.

Appellant's next claim of trial counsel's ineffectiveness concerns her failure to object when the prosecutor stated in her closing argument that she "'couldn't [help] but get a little sick' and that she 'couldn't help but clutch my stomach just a little bit' as she considered the Appellant's alleged actions or when she described the Appellant's actions as "'sick. . . .'" Appellant's Brief at 16. Appellant contends that in uttering these words, the prosecutor was "both attempting to inflame the passions and prejudices of the jury but also expressing her personal belief and opinion." *Id.*

This Court has observed that "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *Commonwealth v. Sampson*, 900 A.2d 887, 890 (Pa. Super. 2006) (quoting American Bar Association (ABA) Standards, Section 5.8.). However, we observe that the prosecutor's statements were not opinions on the truth of the testimony or Appellant's guilt. Rather, they described the prosecutor's reactions to Appellant's testimony and demeanor.

In any event, even if the remarks were an improper expression of the prosecutor's personal opinion, "they cannot be characterized as prosecutorial misconduct unless their effect was to 'prejudice the jury, forming in their minds

fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict.'" **Commonwealth v. Chmiel**, 889 A.2d 501, 545 (Pa. 2005) (quotation omitted). Nothing in the record indicates that these statements had such an effect. Further, the trial judge reminded the jurors that counsels' arguments are not evidence and inferences drawn by counsel are not binding on the jury. N.T., 2/26/10, at 16.

Finally, aside from Appellant's succinct representation that "the comments made by the prosecutor were harmful and could have impacted the outcome of the trial," Appellant's Brief at 16, Appellant has failed to demonstrate actual prejudice arising from counsel's ineffectiveness, *i.e.*, that there was a reasonable probability that but for counsel's alleged errors, the outcome of the trial would have been different. **Commonwealth v. Mallory**, 941 A.2d 699. Here, Appellant merely claimed without elaboration that the outcome **could** have been different but for trial counsel's decision not to object to the prosecutor's closing argument. This bald assertion could not satisfy his burden to show that if trial counsel had objected, a mistrial would have been granted, and that he would have prevailed on appeal if a mistrial had been requested and denied. Indeed, the PCRA court, who also presided over Appellant's trial, concluded that "even if Appellant's counsel had objected to the prosecutor's comments during closing argument, and contested them on appeal, the outcome would not have been different." PCRA Court Opinion, 12/3/19, at 8.

For all of the above reasons, we conclude that Appellant's underlying claim that prosecutorial misconduct warranted a new trial lacks merit. Therefore, Appellant's derivative IAC claim does not warrant relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/20