J-S20025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RASHEED GRANT | : | |
| | : | |
| Appellant | : | No. 1677 EDA 2022 |

Appeal from the PCRA Order Entered June 24, 2022,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s):  CP-51-CR-0004010-2017.

BEFORE:   DUBOW, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                **FILED JULY 17, 2023**

Rasheed Grant appeals from the order denying his first petition for relief filed under the Post Conviction Relief Act ("PCRA").  42 Pa.C.S.A. §§ 9541-46. We affirm.

The trial court opinion from Grant's direct appeal previously summarized the pertinent facts and testimony at trial in detail.  As to the Commonwealth's evidence, the trial court stated:

> At trial, Police Officer Daniel Flanagan ("Officer Flanagan") testified that on March 28, 2017, around 2:45 p.m., he received a radio report of a gunshot on the 700 block of North Uber Street in the city and county of Philadelphia, Pennsylvania.  Officer Flanagan was about four (4) blocks away, and he activated his vehicle's lights and sirens and arrived at the location "probably in less than two minutes."  He was the first officer on the scene and was met there by Michelle Ayres ("Ms. Ayres"), who advised that

_____

[*] Retired Senior Judge assigned to the Superior Court.

[Grant] had just fired a gun at her granddaughter, Shaquetta Alexander ("Shaquetta"). Ms. Ayres advised that [Grant] fired one shot from near the end of her block, where Uber Street intersects with Brown Street. [Grant] fired the shot while standing on "the south sidewalk of Brown Street on the southeast corner," on the "other side of a fence" that faced Brown Street. [Grant] had already left the scene, however, and Officer Flanagan did not observe any bullet holes. To Officer Flanagan's knowledge, no bullet was ever recovered. Once additional officers arrived, Officer Flanagan transported Ms. Ayers to Central Detectives to be formally interviewed.

Meanwhile, Shaquetta remained inside Ms. Ayres' house and "didn't want anything to do with the police." When Officer Flanagan entered the residence to speak with Shaquetta, "she ran down to a lower bedroom and slammed the door and said something to the effect from behind the door that she wasn't talking to the police."

Ms. Ayres testified that Shaquetta, whom Ms. Ayres "raised," lived at Ms. Ayres' home at the time of the shooting was in a relationship with [Grant]. [Ms. Ayres testified that Shaquetta and Grant had "an on and off again type relationship," although Grant eventually "started beating" Shaquetta, she "kept going back to him."] Ms. Ayres explained that she was home watching television with Shaquetta and Shaquetta's 2 or 3-year-old daughter when Shaquetta engaged in an argument with Grant over the telephone. Less than five (5) minutes after the phone conversation, Shaquetta went outside to meet [Grant] in person, and they resumed their argument in front of the neighboring home at 767 North Uber Street.

From her exterior doorway, Ms. Ayres observed [Grant] "calling Shaquetta all kinds of . . . foul names" and then strike her "upside the head." After witnessing the physical violence, Ms. Ayres told her granddaughter to return inside the house, but Shaquetta initially refused and said she would "handle" the situation. Fearing for Shaquetta's safety, Ms. Ayres called 911 on her cell phone.

Shaquetta eventually returned to Ms. Ayres' driveway and [Grant] walked away toward Brown Street. While Ms. Ayres was on the phone with the 911 dispatcher, she saw [Grant] stop near the corner of Uber and Brown Streets, retrieve a dark-colored gun from beneath his maroon or burgundy hoody, and point the

weapon toward Shaquetta. Ms. Ayres told Shaquetta to "duck! Get down," and [Grant] fired the gun. The gunshot "made a big loud noise" but fortunately no bullet struck Shaquetta (or anyone else). Ms. Ayres informed the 911 dispatcher about the gunshot as [Grant] walked away toward 19th and Brown Streets. The Commonwealth played the 911 call at trial and Ms. Ayres can be heard telling the dispatcher that [Grant] had just shot a gun at her granddaughter. A sound resembling a gunshot is also audible.

Following the incident, Ms. Ayres provided a written statement at Central Detectives, which was identical to her trial testimony. Ms. Ayres advised in her statement that she was standing in front of her screen door watching Shaquetta and [Grant] argue in front of her neighbor's residence. After striking Shaquetta on the head, [Grant] walked away to the intersection of Uber and Brown Streets and made a right turn down Brown Street. While standing on the sidewalk of Brown Street, at the edge of the fence near the corner home, [Grant] retrieved a gun from beneath his hoody and fired one shot at Shaquetta.

Detective John Gallagher was the detective who interviewed and obtained Ms. Ayres' statement. He testified that following the interview, he went to the crime scene but encountered no witnesses with any pertinent information. Although Detective Gallagher knocked on the door of several neighbors, only one man spoke to him, and that individual advised that he neither heard nor say anything regarding the incident.

Ms. Ayres informed Detective Gallagher that [Grant] shot at Shaquetta from the [] 1900 block of Brown Street, as he stood beside a bush that was located to his left side. A 45-caliber fired cartridge casing (FFC) was recovered in this area, but the actual bullet discharged from the casing was never recovered.

Trial Court Opinion, 7/8/19, 2-4 (footnotes omitted).

The trial court then summarized the testimony presented by Grant, as follows:

[Grant] presented the testimony of Latanya Walker ("Ms. Walker") and Shaquetta. Ms. Walker, who claimed to be [Grant's] "close personal friend," testified that on the day of the incident she had driven [Grant] to the vicinity of 19th and Brown Streets. [Grant] then exited the vehicle and walked around the corner to

the 700 block of North Uber Street.  After waiting in her vehicle for around a minute, Ms. Walker likewise exited her vehicle and followed [Grant] without his knowledge.

Ms. Walker testified that she observed [Grant] and Shaquetta having a conversation on North Uber Street.  When [Grant] turned away from Shaquetta and began walking back down Brown Street, Ms. Walker "scurried back to the car."  Ms. Walker testified that she never saw [Grant] carrying or firing any gun, and that when [Grant] returned to her vehicle, she simply took him to his doctor's appointment.

Shaquetta testified last and described her "on and off again relationship" with [Grant].  She claimed that on the day of the incident she was arguing with [Grant] over the phone.  [Grant] thereafter came to Ms. Ayres' home and they resumed their argument outside the corner house at 769 Uber Street, while Ms. Ayres watched them from the doorway of her home.

Shaquetta testified that she started "yelling" and "cussing" and [Grant] "turned to walk away," but she "grabbed his arm" and they continued arguing.  Shaquetta claimed that after [Grant] began walking away, again, she returned inside Ms. Ayres' home and then heard Ms. Ayres scream, "Oh, my God, he has a gun!" However, Shaquetta herself denied that [Grant] possessed or fired any gun at her.  Regarding the 911 recording on which a gunshot is purportedly audible, Shaquetta claimed that the noise was Ms. Ayers' screen door slamming when Shaquetta entered the house. Shaquetta claimed the door was missing the contraption that prevented the door from slamming shut, and thus when the door shut, it made a "loud bang."

[Shaquetta further testified that she told a police lieutenant who responded to the scene that Grant did not shoot her or possess a gun.  She as well attended Grant's preliminary hearing, and, while she did not testify, she told the District Attorney she had no desire to "press any charges" against Grant "because nothing happened."  Shaquetta additionally wrote several letters to the District Attorney's Office advising that she did not want charges pressed against Grant.  She also visited the District Attorney's Office in person to urge the Commonwealth to drop charges against Grant.]

Trial Court Opinion, 7/8/19, at 5-6 (footnotes omitted).

Lastly, the trial court summarized the evidence the Commonwealth presented in rebuttal, regarding a prior incident involving Shaquetta and Grant:

On April 12, 2017, around two weeks after the alleged shooting, Shaquetta and [Grant] had another "heated argument" during which [Grant] repeatedly struck Shaquetta and gave her a black eye. After being treated at the hospital, Shaquetta provided a written statement to police and filed a criminal complaint against [Grant]. Shaquetta's statement described how [Grant] punched and kicked her multiple times in the face, pulled her by the hair, and "slammed" her into a wall - - all in the presence of Shaquetta's daughter. Following this incident, Shaquetta went to Family Court and obtained a temporary protection from abuse order against [Grant], but she failed to return to Court a few days later to finalize the order. She later informed the District Attorney that she did not want any charges pressed against [Grant].

Trial Court Opinion, 7/8/19, at 6 (citations omitted).

On August 10, 2018, a jury convicted Grant of carrying a firearm without a license and carrying a firearm without a license on the public streets of Philadelphia. The jury acquitted Grant of aggravated assault and possession of an instrument of crime. After the jury trial, the trial court conducted a stipulated bench trial and found Grant guilty of persons not to possess a firearm. On December 7, 2018, the trial court sentenced Grant to an aggregate term of seven to fourteen years in prison. Thereafter, Grant filed a post-sentence motion in which he sought reconsideration of his sentence. The trial court denied the motion.

Grant appealed to this Court and challenged the weight and sufficiency of the evidence supporting his convictions. We affirmed his judgment of

sentence on August 19, 2020. ***Commonwealth v. Grant***, 240 A.3d 174 (Pa. Super. 2020) (non-precedential decision). In his sufficiency challenge, Grant claimed that Ms. Ayers' eyewitness testimony was "so inherently unreliable that a verdict based upon it could amount to no more that surmise and conjecture." ***Id.*** at 2. We found this claim not preserved for our review, because it was not raised with specificity in his Pa.R.A.P. 1925(b) statement. ***Id.*** at 4. In a footnote, we concluded that, even if not waived, the sufficiency challenge was meritless because any inconsistencies in her testimony were minor and her testimony "dovetailed with the audio recording of her account of the incident as it unfolded while on a 911 call, her statements to the responding police officers, and her written statement of the event." ***Id.*** at 5 n.1. As to his weight claim, we found that it was waived because he raised it for the first time in his Rule 1925(b) statement, rather than in a post-sentence motion. ***Id.*** at 7.

Grant sought further review. On December 23, 2020, our Supreme Court denied Grant's petition for allowance of appeal. ***Commonwealth v. Grant***, 242 A.3d 1290 (Pa. 2020).

Grant filed a *pro se* PCRA petition on September 23, 2021. The PCRA court appointed counsel, who filed an amended petition on January 19, 2022. The Commonwealth filed a motion to dismiss. On June 9, 2022, the PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to dismiss Grant's amended petition without a hearing. Grant did not file a response. By order entered

June 24, 2022, the PCRA court denied the petition. This timely appeal followed. Both Grant and the PCRA court have complied with Pa.R.A.P. 1925.

Grant raises the following three issues, which we reordered for ease of disposition:

> Whether the PCRA court's finding[s] are supported by the record and free of legal error by refusing to grant the relief requested in [Grant's] PCRA petition based upon the following:
>
> I.    Whether trial counsel was ineffective for failing to file a post-verdict motion that the verdict was against the weight of the evidence.
>
> II.   Whether appellate counsel was ineffective for failing to appeal the denial of the motion to reconsider sentence.
>
> III.  Whether the PCRA Court erred in denying [Grant's] PCRA petition without an evidentiary hearing on the issues raised in the amended PCRA petition.

Grant's Brief at 8 (excess capitalization omitted).

Our scope and standard of review is well-settled:

> In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions *de novo.*

***Commonwealth v. Reyes-Rodriguez***, 111 A.3d 775, 779 (Pa. Super. 2015) (internal citations and quotations omitted).

Grant's first two claims challenge the effectiveness of counsel. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. **_Commonwealth v. Johnson_**, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." **_Id._** This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. **_Id._** at 533. A finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **_Id._** In assessing a claim of ineffectiveness, when it is clear that the petitioner has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. **_Commonwealth v. Travaglia_**, 661 A.2d 352, 357 (Pa. 1995). Counsel cannot be deemed ineffective for failing to pursue a meritless claim. **_Commonwealth v. Loner_**, 836 A.2d 125, 132 (Pa. Super. 2003) (_en banc_).

In his first issue, Grant contends that trial counsel provided ineffective assistance by failing to file a post-sentence motion challenging the weight of

the evidence. Before determining ineffectiveness, we first determine the merits of Grant's underlying claim.

This Court summarized the law regarding challenges to the weight of the evidence as follows:

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock it conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015) (citations omitted). As we have often reiterated, "the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Cousar*, 928 A.2d 1025, 1036 (Pa. 2007).

Although on direct appeal this Court found Grant's weight claim waived, the trial court still addressed this claim in its Rule 1925(a) opinion, and found it to be meritless:

> Here, the Commonwealth relied primarily on the statements and testimony of Ms. Ayres to establish that [Grant] unlawfully possessed a firearm on March 28, 2017. [The parties stipulated

- 9 -

that at the time of the incident, Grant did not possess a valid license to carry a firearm in the Commonwealth of Pennsylvania.]

Ms. Ayres testified that [Grant] and Shaquetta were engaged in an argument during which [Grant] called Shaquetta "all kinds . . . of foul names" and struck her "upside the head." Ms. Ayres called 911, and while speaking with the dispatcher, she saw [Grant] retrieve a dark-colored gun from beneath his hoody, point the weapon at Shaquetta, and fire the gun. On the tape recording of the 911 call, Ms. Ayres can be heard saying that [Grant] had just shot his gun at Shaquetta, and a sound resembling a gunshot is audible.

When police officers arrived only minutes later, Ms. Ayres essentially repeated the same facts to them – *i.e.*, that [Grant] and Shaquetta were arguing, that [Grant] struck Shaquetta, and that [Grant] then pulled out a gun and fired a shot at Shaquetta. Ms. Ayres also pinpointed the location where [Grant] stood when he fired the gun. Furthermore, Ms. Ayres' written statement to Detective Gallagher is consistent with her testimony at trial, her contemporaneous statements to the 911 dispatcher, and her statements to responding police officers.

Accordingly, the jury's finding that [Grant] carried a firearm in violation of 18 Pa.C.S. §§ 6106 and 6018, and this [c]ourt's finding that [Grant] possessed a firearm in violation of 18 Pa.C.S. § 6105, clearly were not "so contrary to the evidence as to shock one's sense of justice." [Grant's] challenge to the weight of the evidence is therefore meritless.

Trial Court Opinion, 7/8/19, at 9 (paragraph breaks added; footnote omitted).

In dismissing Grant's first ineffectiveness claim, the PCRA court, who also sat as the trial court, reaffirmed that Grant's weight claim was meritless given the consistent testimony from Ms. Ayres. Referencing our discussion in the footnote from Grant's direct appeal, **see supra**, the PCRA court further agreed that "[a]ny inconsistencies in Ms. [Ayres'] testimony were minor and

as such a challenge to the weight of the evidence claim would not have entitled [Grant] to any relief." PCRA Court Opinion, 10/24/22, at 5.[1]

In arguing to the contrary, Grant asserts that the PCRA court "erroneously dismissed [his first ineffectiveness] claim without evaluating the weight of [the defense witnesses'] testimony which directly contradicted the testimony of Ms. [Ayres]." Grant's Brief at 15. According to Grant, "the evidence at trial showed that Ms. [Ayres] made inconsistencies during her testimony and was motivated to fabricate her story based on her hatred for [him]." *Id.*

Applying our standard of review, we discern no abuse of discretion in the trial court's reasoning. Grant's claim to the contrary merely asks this Court to reassess the credibility determinations made by the fact-finder. This we cannot do. *Gonzalez*, *supra*. Moreover, although Grant challenges the court's characterization of the inconsistencies in Ms. Ayres' testimony as minor, he does not adequately explain how any particular inconsistency would render the verdict against the weight of the evidence.[2]

_____

[1] Contrary to the PCRA's court's reference, in the footnote in *Grant*, *supra*, we stated that even if preserved, Grant's **sufficiency** challenge would be meritless.

[2] Although Grant challenges the PCRA court's statement regarding the consistency of Ms. Ayres' testimony as "a complete misrepresentation of the evidence," the only inconsistency Grant addresses was whether Ms. Ayres was inside or outside her home when the gun was fired. **See** Grant's Brief at 22-23. Grant does not explain how this inconsistency rendered Ms. Ayres entire trial testimony unworthy of belief. Moreover, in the footnote addressing
*(Footnote Continued Next Page)*

- 11 -

Accordingly, as there is no merit to Grant's underlying weight of the evidence claim, he is not entitled to relief on his claim that trial counsel was ineffective in failing to file a post-sentence motion preserving the claim for appeal.

In his second issue, Grant asserts that his appellate counsel was ineffective for failing to appeal the discretionary aspects of his aggregate sentence. According to Grant, his sentence of seven to fourteen years of imprisonment was "harsh and unreasonable because [he] has begun to turn his life around, and such a lengthy sentence prevents him from being able to financially care for his daughter." Grant's Brief at 15-16. We conclude this claim warrants no relief.

In order to establish prejudice with respect to a claim of ineffective assistance of appellate counsel, "the [PCRA] petitioner must show that there is a reasonable probability that the outcome of the direct appeal proceeding would have been different but for counsel's deficient performance." **Commonwealth v. Blakeney**, 108 A.3d 739, 750 (Pa. 2014). Once again, we first determine whether Grant's sentencing claim had merit.

Sentencing is matter vested in the sound discretion of the sentencing court. **Commonwealth v. Hill**, 66 A.3d 365, 370 (Pa. Super. 2013). The sentencing court is given broad discretion in determining whether a sentence

---

Grant's sufficiency claim, we agreed with the trial court's belief that only minor inconsistencies occurred during Ms. Ayres' testimony. **Grant**, non-precedential decision at 5 n.1.

is manifestly excessive because the sentencing judge is in the "best position to measure factors such as the nature of the crime, the defendant's character and the defendant's display of remorse, defiance, or indifference." *Commonwealth v. Riggs*, 63 A.3d 780, 786 (Pa. Super. 2012) (citation omitted). Thus, a sentence will only be deemed an abuse of discretion where it is obviously unreasonable or where the record demonstrates that it was the result of partiality, prejudice, bias, or ill-will. *Commonwealth v. Clarke*, 70 A.3d 1281, 1287 (Pa. Super. 2013).

Moreover, when the trial court had the benefit of a pre-sentence report ("PSI"), we must

> presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A [PSI] constitutes the record and speaks for itself. . . . Having been fully informed by the [PSI], the sentencing court's discretion should not be disturbed. This is particularly true . . . in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them in the case at hand.

*Commonwealth v. Hallock*, 603 A.2d 612, 616 (Pa. Super. 1992) (quoting *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988)).

Finally, we will only reverse a sentence within the statutory guidelines if the application of the guidelines is unreasonable, that is, if the sentencing court imposed the sentence without express or implicit consideration of the general standards of section 9721(b) of the Sentencing Code. To comply with

these standards, a sentencing court must consider the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. ***Commonwealth v. Coulverson***, 34 A.3d 135, 147 (Pa. Super. 2011).

At the sentencing hearing held on December 7, 2018, the trial court referenced Grant's pre-sentence report, was informed of the applicable guidelines, and then heard argument from the parties. In addition, Shaquetta Alexander testified regarding Grant's character and mitigating circumstances; Grant's father was also present. Grant also exercised his right of allocution, and informed the court of programs that he participated in while incarcerated. The trial court then provided the lengthy comments before imposing sentence:

> **THE COURT:** All right, thank you.
>
> I have reviewed the presentence report. It notes [Grant] was primarily raised by his father who was a master electrician and carpenter. [Grant's father] is here today, and [Grant] was provided with all of his needs. And [Grant] did manage to graduate from high school in 1997. There is no formal training. It says that he can do carpentry but there is no formal training and there is no record of employment. . . . Oh, temp agency for $1,600.
>
> There doesn't seem to be any medical, mental health, . . . no other health issues, substance abuse with [m]arijuana.
>
> As far as [Grant's] prior record, you know, it's abysmal. As a juvenile, nine arrests, eight adjudications, four commitments from age 15 through age 16. And just constant, criminal mischief, institutional vandalism, receiving stolen property, attempted theft. And then we get [to] age 16, aggravated assault. So [Grant] spent much of his time in juvenile commitment.
>
> And then when he turns 18 there is no lapse in criminal activity; nine arrests as an adult, three convictions, four commitments, three violations of probation and parole, including this one. Age 18, aggravated assault[.] Age 22, carjacking for

- 14 -

which he got a five-to-ten-year sentence. And now at age 37, we are here.

It's a record of a life that has been just replete with conviction after conviction after conviction and for very violent crimes.

So, I'm pleased that [Grant] is now at this age starting to understand, starting to show some maturity in regard to his decisions that he's making, decisions to take advantage of these programs and I think sincerely start to benefit from these type of programs. Certainly, programs such as this were available and offered to him in the past throughout all your many, many, many, custody and probation supervisions, but nothing seemed to really take. To [] really have no discernable record of employment at this point in life. I understand you were incarcerated for a fair amount of time, but even when you get out, nothing.

So, turning to the case involved here, it's very, very sad to see a family at odds with one another and for one family member to come in and testify that she saw [Grant] shoot at . . . her granddaughter, and for then [Shaquetta] to come in and say that her grandmother was lying and testified to that on the stand, it's very heartbreaking. Clearly, the jury believed Ms. [Ayres]. [T]here is [a] record of [Grant] abusing [Shaquetta] . . . after this happened[.] And for some reason I guess whatever reason as [Shaquetta] explained to the court, she still has very strong feelings for [Grant], doesn't want him incarcerated for reasons that she has that I won't comment on, but they are her reasons and I thank you for coming into court and stating them for me so that I can take that into consideration.

I think [Grant] you are just starting down the road of possibly rehabilitating. The horrendous behavior and violent propensity that you had over the years, certainly on March 17th you - - quite frankly, you could have killed this woman[.] I understand your maintaining your innocence, the jury found you guilty of having that gun. . . . [Y]ou are a felon who is never, ever permitted to have a gun[.]

The guidelines for you are certainly very high because of all of this prior criminal activity. The guidelines are for six to twelve years, and I understand that you expect some mitigation by the court and I will take that into consideration.

N.T., 12/7/18, at 20-24 (some formatting adjusted).

The trial court then imposed the aggregate sentence of seven to fourteen years of incarceration. When Grant began to question the length of the sentence, the court further stated, "it's not an aggravated sentence, it's a very fair sentence under the circumstances here." *Id.* at 26.

In rejecting Grant's claim that appellate counsel was ineffective for failing to challenge the denial of his discretionary sentencing claim, the PCRA court summarized the PCRA court explained the rationale supporting its sentencing choice as follows:

> [Grant] was sentenced within the [sentencing guidelines] and below the sentence recommended by the Commonwealth. The [c]ourt specifically considered [Grant's PSI], his staggering criminal history in the city of Philadelphia, his failures to rehabilitate, and his conduct in this case. The [c]ourt noted [Grant's] "abysmal" criminal history that included no less than nine (9) juvenile adjudications for a myriad of crimes and that his criminal activity has continued unabated through adulthood, with multiple arrests and convictions. The trial court noted that "notwithstanding the many opportunities provided to him, [Grant] thus far has made precious little effort to rehabilitate. He is a serial offender with a record of [a] life that has been just replete with conviction after conviction after conviction for very violent crimes."
>
> Because the trial court acted within its discretion in crafting [Grant's] sentence, [Grant's ineffectiveness] does not merit relief.

PCRA Court Opinion, 10/24/22, at 6 (citations and footnote omitted).

Our review of the record supports the PCRA court's conclusions. The trial court considered Grant's pre-sentence report and imposed a guideline-range sentence. Thus, we presume that the trial court was aware of the

statutory mitigating factors and weighed them accordingly. **Hallock**, **supra**. Indeed, given the court's lengthy comments enumerated above, the trial court clearly considered Grant's recent efforts at rehabilitation and other mitigating factors.

In essence, Grant claims that the trial court did not give sufficient weight to these factors. Such a claim does not raise a substantial question, which would permit this Court to review the discretionary aspects of his sentence. **Commonwealth v. Ratushny**, 17 A.3d 1269, 1273 (Pa. Super. 2011). Thus, appellate counsel cannot be deemed ineffective for failing to raise this meritless claim on appeal. **Loner**, **supra**.

In his final issue on appeal, Grant asserts that the trial court erred in denying his PCRA petition without a hearing. As our Supreme Court has summarized:

> The PCRA court has discretion to dismiss a petition without a hearing when the court is satisfied that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings. [**See** Pa.R.Crim.P. 909(B)(2).] To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing.

**Commonwealth v. Blakeney**, 108 A.3d at 750 (citations omitted).

Grant asserts that "a hearing should be held on any issue that the PCRA [c]ourt is not certain lacks merit." Grant's Brief at 15. Here, as demonstrated

above, the PCRA could had no uncertainty as to the meritless nature of Grant's ineffectiveness claims.

In sum, the PCRA court correctly determined that Grant's ineffectiveness claims lacked merit and that an evidentiary hearing was not warranted. We therefore affirm the order denying Grant post-conviction relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2023